NANCY MORALES *v.* PENTEC, INC., ET AL.
(AC 18653)

Schaller, Hennessy and Dupont, Js.

Argued December 16, 1999—officially released April 18, 2000

*Cynthia W. Sheppard,* with whom, on the brief, was *Robert I. Reardon, Jr.,* for the appellant (plaintiff).

*Edward Maum Sheehy,* with whom, on the brief, was *Michael R. Brandt,* for the appellees (defendants).

DUPONT, J. The plaintiff, Nancy Morales, brought this action in a three count complaint against the defendants, PenTec, Inc., and Michael E. Callahan, for breach of an employment contract with regard to a pension and profit sharing plan in the first count, medical benefits in the second count and failure to pay wages pursuant to General Statutes § 31-72 in the third count. The trial court directed a verdict in favor of the defendants as to the latter claim. The jury returned a verdict in favor of the plaintiff in the amount of $26,500 on the first count and $2670 on the second count. On appeal, the plaintiff claims that the court improperly (1) directed the verdict in favor of the defendants on count three, (2) ordered a remittitur in the amount of $17,220 on count one and (3) instructed the jury as to the plaintiff's claim for medical benefits.

The following facts and procedural history are relevant to our resolution of this appeal. The plaintiff and her husband were the original owners of PenTec, Inc., which provided pension consulting for small businesses. The two started the company in 1983 and were its only full-time employees. They established two pension plans through the company to provide benefits to themselves. Under the money purchase plan, the company would contribute to the pension plan 10 percent of what a full-time employee earned during one plan year. A key employee such as the plaintiff could waive her compensation, meaning that she could elect to have some or all of her salary exempted from the calculation of the company's required 10 percent contribution. The second plan was the profit sharing plan and trust, under which the company could contribute up to 15 percent of an employee's salary to the plan at its option, depending on whether it had profits for that year.

The company also adopted a medical reimbursement plan. Under this plan, the company was required to reimburse all full-time employees for medical expenses actually incurred, including those for routine medical, dental, vision and hearing care. The company also purchased a major medical policy. Thus, all of the plaintiff's health care costs were covered under either the major medical plan or the self-insured portion of the company's medical plan while she and her husband were the company's full-time employees.

In 1987, the plaintiff's husband died. Thereafter, the plaintiff decided to sell the company to the defendant Michael E. Callahan. Callahan also bought the name PenTec, Inc., and started a new corporation named PenTec, Inc., the other defendant in this action. As part of the purchase and sale of the company, the plaintiff and Callahan executed an employment agreement. The agreement provided that the plaintiff was to render consulting and advisory services to PenTec, Inc., for a period commencing with the date of the agreement, June 19, 1987, through March 31, 1991. The plaintiff was to receive a salary of $82,500 from April through March 31 of each year, except that for the partial year 1987-88, the salary was to be $52,500.

The agreement also provided in relevant part: "Company shall take over and administer the pension and welfare programs in which [the plaintiff] participated while employed by her corporation, PENTEC, INC., provided that [the plaintiff] shall continue as a Trustee under such plans. [The plaintiff] shall continue to be eligible to participate in all pension, profit sharing and similar plans of Company for the benefit of its employees and executives. Any employer contributions made to these plans on behalf of [the plaintiff] shall be considered to be part of her salary referred to above. . . . [The plaintiff] shall be provided with the same level of medical benefits as previously provided by PENTEC,

INC., at no cost to her. Reimbursement for or insurance premiums for medical benefits shall be in addition to the compensation referred to above."

In addition to what she was required to do under the employment agreement, the plaintiff worked in the office of PenTec, Inc., until June, 1988. For this work, she was paid a salary of $40,000 in addition to the payments made to her under the employment agreement.

At an annual meeting of the board of directors of Pentec, Inc., on May 27, 1988, the plaintiff and the defendants agreed that no contributions would be made by either PenTec, Inc., or the plaintiff to the money purchase pension plan or the profit sharing plan and trust for the year ending March 31, 1988. For the plan year ending March 31, 1989, the plaintiff elected to waive that part of her salary paid under the employment agreement in connection with both pension plans. She made no contributions to either plan for the plan year ending March 31, 1989.

In 1989, the defendants terminated the pension plans while the employment agreement was still in effect. As a result, the plaintiff could not participate in either pension plan for 1990 or 1991. The plaintiff thereafter rolled all of her assets in the pension plans into an individual retirement account (IRA).

Subsequent to the parties' execution of the employment agreement, the defendants amended the medical reimbursement plan. First, the defendants amended the plan to place a cap on the amount PenTec, Inc., would reimburse an employee for a claim and, second, the plan was amended to limit its covered expenses. The plaintiff incurred dental and medical expenses in the amount of $19,737.51, which she submitted to the defendants. The defendants denied reimbursement, claiming that the bills were not covered by the medical plan.

The plaintiff brought the present action in three counts against the defendants by way of an amended complaint dated June 4, 1993. In the first count, the plaintiff alleged a breach of the employment agreement because the defendants failed to maintain a profit sharing and money purchase plan in which she was entitled to participate. In count two, the plaintiff also alleged a breach of the employment agreement because the defendants failed to provide the same level of medical benefits that she was entitled to prior to the sale of the company as required by the agreement. In count three, the plaintiff alleged that because of the defendants' failure to pay medical benefits and to make or allow the plaintiff to contribute to the pension plans, the defendants violated § 31-72.

The court directed a verdict in favor of the defendants on count three. The jury returned a verdict in favor of the plaintiff on count one in the amount of $26,500 and on count two in the amount of $2670. Thereafter, the court granted the defendants' motion for remittitur, finding that the verdict on count one was excessive and ordering the plaintiff to remit the amount of $21,220. After hearing reargument, the court reduced the order of remittitur to $17,220, and ordered that the verdict be set aside and that there be a new trial if the plaintiff failed to comply with the order of remittitur. This appeal followed.[1]

I

The plaintiff first claims that the court improperly directed a verdict in favor of the defendants on count

[1] We note that the order of remittitur presented the plaintiff with alternatives. "The plaintiff is not compelled to remit the sum suggested by the trial court, but may elect either to submit to a new trial, or to seek, by an appeal to this court . . . to have the order of new trial reversed and judgment rendered for the full amount of the verdict." (Internal quotation marks omitted.) *Doroszka* v. *Lavine*, 111 Conn. 575, 579, 150 A. 692 (1930); see *Civiello* v. *Owens-Corning Fiberglass Corp.*, 208 Conn. 82, 85–86, 544 A.2d 158 (1988); General Statutes § 52-228a. Thus, the order is a final judgment for purposes of appeal.

three. Count three alleges a cause of action pursuant to § 31-72 on the basis of the facts set forth in counts one and two. The first two counts allege a breach of an employment agreement, which the plaintiff claimed entitled her to certain pension, profit sharing and medical benefits.[2] We conclude that the court properly directed the verdict.

"The rules controlling appellate review of a directed verdict are well settled. Directed verdicts are not generally favored. A trial court's decision to direct a verdict can be upheld only when the jury could not reasonably and legally have reached any other conclusion. . . . We review a trial court's decision to direct a verdict for the defendant by considering all of the evidence, including reasonable inferences, in the light most favorable to the plaintiff." (Internal quotation marks omitted.) *Phinney* v. *Casale*, 40 Conn. App. 495, 499, 671 A.2d 851 (1996). A verdict may be directed where the decisive question is one of law or where the claim is that there is insufficient evidence to sustain a favorable verdict. Id.

The parties, in their briefs and at oral argument in this court, claim that the court directed a verdict on count three because it concluded that the plaintiff's pension and medical benefits did not constitute wages within the meaning of § 31-72. The defendants' oral motion for a directed verdict was based on this same claim. Our review of the transcript reveals that when the court directed the jury to render a verdict for the defendants, the court's only statement was that "there was insufficient evidence to find for the plaintiff on this claim." No memorandum of decision, pursuant to Practice Book § 64-1 (a) (6), was written by the court,

---

[2] The same factual occurrence can give rise to both a violation of statutory rights and contractual rights. *Shortt* v. *New Milford Police Dept.*, 212 Conn. 294, 307, 562 A.2d 7 (1989).

and we do not know its reasoning. We review the claim of the plaintiff on the premise that the reason for the court's direction of the verdict is as stated by the parties and as requested by the defendants. See *Lombardi* v. *J. A. Bergren Dairy Farms, Inc.*, 153 Conn. 19, 21, 213 A.2d 449 (1965).

Our consideration of whether the term "wages" in § 31-72 includes pension and medical benefits is guided by well established principles of statutory construction. "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . *Wright Bros. Builders, Inc.* v. *Dowling*, 247 Conn. 218, 226, 720 A.2d 235 (1998); *State* v. *Albert*, 50 Conn. App. 715, 719, 719 A.2d 1183 (1998), cert. granted on other grounds, 247 Conn. 954, 723 A.2d 810 (1999). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Luce* v. *United Technologies Corp.*, 247 Conn. 126, 133, 717 A.2d 747 (1998)." (Internal quotation marks omitted.) *New Milford Savings Bank* v. *Jajer*, 52 Conn. App. 69, 78–79, 726 A.2d 604 (1999).

We begin our analysis with a review of the pertinent statutory language. Section 31-72 provides that "[w]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k[3] . . . such employee . . .

---

[3] General Statutes § 31-76k provides: "If an employer policy or collective bargaining agreement provides for the payment of accrued fringe benefits upon termination, including but not limited to paid vacations, holidays, sick days and earned leave, and an employee is terminated without having

may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court . . . ." General Statutes § 31-71a (3) defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation . . . ."

The appellate courts of this state have not yet considered whether the term "wages" in § 31-72 includes pension and medical benefits. *Fulco* v. *Norwich Roman Catholic Diocesan Corp.*, 27 Conn. App. 800, 609 A.2d 1034 (1992), appeal dismissed, 226 Conn. 404, 627 A.2d 931 (1993), however, is instructive in our analysis of this claim. In *Fulco*, we determined whether an amendment to § 31-72, effective on July 1, 1990, should apply retrospectively to a plaintiff who was discharged in 1989 and, if not, whether the term "wages" in § 31-72 was broad enough to include vacation pay. Id., 804–805. The court held that the trial court properly refused to apply the amendment retrospectively, reasoning that "it is significant that the legislature chose not to amend the statutory definition of 'wages' set forth in § 31-71a (3). Instead, it altered the text of § 31-72, which delineates the breadth of statutory liability, by authorizing double damages when an employer fails to pay an employee wages or fails to compensate an employee in accordance with [General Statutes §] 31-76k . . . . The use of the disjunctive 'or' clearly indicates that compensation in accordance with § 31-76k is distinct

received such accrued fringe benefits, such employee shall be compensated for such accrued fringe benefits exclusive of normal pension benefits in the form of wages in accordance with such agreement or policy but in no case less than the earned average rate for the accrual period pursuant to sections 31-71a to 31-71i, inclusive."

The plaintiff does not claim that the defendants failed to compensate her in accordance with § 31-76k, and she specifically disclaimed any reliance on this section in her argument to the trial court in which she objected to the direction of a verdict on count three.

from wages. See *State* v. *Dennis*, 150 Conn. 245, 248, 188 A.2d 65 (1963)." (Internal quotation marks omitted.) *Fulco* v. *Norwich Roman Catholic Diocesan Corp.*, supra, 804–805. Although we are not here concerned with § 31-76k, we accept *Fulco*'s reasoning that the legislature intended that § 31-76k and the statutory definition of wages in § 31-71a (3) concern different types of remuneration. Section 31-76k addresses payment for accrued fringe benefits upon termination of employment, including certain fringe benefits, whereas § 31-72 relates to "wages" as defined in § 31-71a (3).

After determining that the amendment should not be applied retrospectively, the court in *Fulco* held that vacation pay was not included in "wages." Id., 804. In construing the plain language of the statute, we stated that "the definition of wages is limited to remuneration for labor or services rendered, and does not include vacation pay, which is compensation for loss of wages." Id.

In another context, *Luce* v. *United Technologies Corp.*, supra, 247 Conn. 126, also is instructive. The court in *Luce* determined that General Statutes § 31-310, a section of the Workers' Compensation Act, which uses the term "average weekly wage," does not include medical, dental, life insurance, pension, vacation or sick pay payments. "Wages" are not defined in the act or in § 31-310. The court concluded that the term "wages" as used in § 31-310 does not include income. Income is defined under another section of the act to include all forms of remuneration from employment, including wages and other benefits. In other words, the court determined that when the term "wages" is used, it is limited, unless otherwise defined, to periodic payment for services and does not include other forms of remuneration.

"Wages" *are* defined in the statutes applicable to the present case, and the definition conforms to the classic

or dictionary definition. Wages are payment for services on a weekly, daily or hourly basis or by the piece. The American Heritage Dictionary (2d Ed. 1991).

"The principal canon of statutory construction is that where the statutory language is clear and unambiguous, we interpret the statute to mean what it says. *Winchester Woods Associates* v. *Planning & Zoning Commission*, 219 Conn. 303, 310, 592 A.2d 953 (1991)." (Internal quotation marks omitted.) *Fulco* v. *Norwich Roman Catholic Diocesan Corp.*, supra, 27 Conn. App. 804. The statutory definition of "wages" as used in § 31-72 is limited on its face and makes no mention of fringe benefits such as pension or medical benefits. "It is the duty of the court to interpret statutes as they are written . . . and not by construction read into statutes provisions which are not clearly stated." (Internal quotation marks omitted.) *New Milford Savings Bank* v. *Jajer*, supra, 52 Conn. App. 79. We conclude that the plain language of §§ 31-72 and 31-71a (3) indicates that the term "wages" in § 31-72 does not include pension and medical benefits.

We see no reason to treat pension and medical benefits differently than *Fulco* treated vacation pay. If the legislature in enacting § 31-72 did not intend to include benefits such as vacation pay within the meaning of "wages" as used in the statute, then it would be illogical to conclude that the legislature intended that other benefits such as pension and medical benefits be included without so specifying.

This, however, does not end our inquiry. The plaintiff relies on General Statutes § 31-89a to support her claim that pension and medical benefits qualify as "wages" under § 31-72.[4] We therefore proceed to analyze § 31-89a, mindful of the principles of statutory construction.

[4] Practice Book § 10-3 (a) provides that when any claim made in a complaint is grounded on a statute, the statute shall be specifically identified by its number. The plaintiff's complaint identifies § 31-72 as her source

Section 31-89a (a) provides: "Payments to employee welfare funds, as defined in subsection (h) of section 31-53, which are past due under the terms of a written contract or rules and regulations adopted by the trustees of such funds shall be considered as wages for the purpose of section 31-72." General Statutes § 31-53 (h) defines an employee welfare fund as "any trust fund established by one or more employers and one or more labor organizations or one or more other third parties not affiliated with the employers to provide from moneys in the fund, whether through the purchase of insurance or annuity contracts or otherwise, benefits under an employee welfare plan . . . 'benefits under an employee welfare plan' means one or more benefits or services under any plan established or maintained for employees or their families or dependents, or for both, including, but not limited to, medical, surgical or hospital care benefits; benefits in the event of sickness, accident, disability or death; benefits in the event of unemployment, or retirement benefits."

The plaintiff claims that according to the plain language of § 31-89a, pension and medical benefits are considered wages for the purpose of § 31-72. She claims that there is nothing in the statute that limits its application and, therefore, it applies here. The defendants claim that § 31-89a applies only to situations involving labor organizations and collective bargaining agreements.

Section 31-53 (h), which defines an employee welfare fund as that term is used in § 31-89a, provides that an employee welfare fund is "any trust fund established by one or more employers and one or more labor organizations or one or more other third parties not affiliated with the employers . . . ." The plaintiff claims, without

for relief. Section 31-89a, however, specifically refers to § 31-72, and the defendants were aware of the plaintiff's reliance on § 31-89a.

reference to any authority, that she constitutes "one or more third parties not affiliated with the employers." We are not persuaded. If the legislature had intended that an employee welfare fund means a trust fund established between an employer and its employee by a contract solely between them, it could have so stated. Instead, it chose the language at issue here.

Furthermore, it appears from the legislative history surrounding the enactment of § 31-89a, that the statute was intended to apply to situations involving labor organizations. The discussion at the hearing before the Joint Standing Committee on Labor of the General Assembly is replete with references to labor organizations and collective bargaining agreements. For example, Norman Zolot, of the Connecticut State Labor Council, explained the reasons for the bill's enactment: "In the building trades, in the bakery industry, in the trucking industry, moving, oil and others, where there are collective bargaining agreements, the agreements provide that the employer shall contribute 10 cents, either 7 cents or 10 cents per hour for each hour worked to the Trust Fund so that the Trustees of that Fund can provide health and welfare benefits or pension benefits or the like. These contributions are usually negotiated in lieu of a wage increase. . . . Pension fund contributions and health and welfare fund contributions, however, are not treated as wages." Conn. Joint Standing Committee Hearings, Labor, 1961 Sess., p. 234.

R. L. Goodman, fund manager of Plumbers' Local 76 Pension Fund, also commented on the bill, stating: "We feel that pension fund, welfare fund contributions should be treated exactly as wages. Those people who were present during the negotiations of the collective bargaining agreements which provided these fringe benefits are well aware that the fringes were accepted and the contributions in lieu of wages. The men themselves feel that these fringe benefits are theirs in the form of

wages and we feel that anything that treats them other than wages is an injustice." Conn. Joint Standing Committee Hearings, supra, p. 240.

Section 31-89a applies to "employee welfare funds" and is included in chapter 559 of the General Statutes, which is titled, "Labor Organizations." While an employee welfare fund is a trust fund established to provide benefits under an employee welfare plan, and such benefits include pension and medical benefits, such funds are clearly limited to those established between an employer and a labor organization or other third party not affiliated with the employer. An employee is usually represented by a labor organization. Even if the employee is not represented by a labor organization, as is true here, it is not logical to treat the employee as being a third party "*not* affiliated with the [employer] . . . ." (Emphasis added.) General Statutes § 31-53 (h). "Affiliated" is a word that implies an association in a subordinate position. The employee here *is* affiliated with the employer.

"There is no question that the legislature may, by the language it uses in a statute or a section of a statute, demonstrate its intent that it be limited or restricted." *Taravella* v. *Stanley*, 52 Conn. App. 431, 440, 727 A.2d 727 (1999). The fact that the legislature, instead of simply amending the definition of wages under § 31-72 to include pension and medical benefits, enacted § 31-89a in connection with other statutes involving labor organizations and limited its application to "employee welfare funds" connotes a legislative intent that pension and medical benefits qualify as wages under § 31-72 in limited circumstances only.

Section 31-89a applies to payments to employee welfare funds as they are defined in § 31-53 (h) and, *if* they are such payments, they shall be considered as wages for purposes of § 31-72. Because we do not believe that

the plaintiff's private contractual agreement with her employer constitutes "an employee welfare fund" for purposes of § 31-89a, that statute is inapplicable to the present case.

In light of the legislative history surrounding the enactment of § 31-89a, its placement in the chapter titled, "Labor Organizations," and because of the limiting language in the statute defining an employee welfare fund, we are not convinced that the legislature intended that all pension and medical benefits constitute "wages" for purposes of § 31-72. We hold that the plaintiff's pension and medical benefits do not qualify as "wages" pursuant to § 31-72 and, therefore, the court properly directed a verdict for the defendants on this claim.

II

The plaintiff claims next that the court improperly ordered a remittitur in the amount of $17,220. We do not agree.

The following additional facts are necessary to our resolution of this claim. The plaintiff testified that her claim for damages in count one arose because of her inability to participate in the money purchase pension plan and the profit sharing plan for the plan years 1989-90 and 1990-91. Specifically, she testified that if the plans had not been terminated, she would have been able to contribute up to 25 percent of her salary under the employment agreement for a maximum possible contribution of $16,500 for each year or $33,000 total. The $33,000 that should have been contributed to her plans for those two years would have been rolled over into her IRA, and she would have had tax free growth on it until she retired. She further testified that by receiving the money as direct compensation rather than making a pension contribution in that amount, she had to pay $2640 in federal income taxes in each of the two

plan years for a total of $5280. Finally, the plaintiff testified that for the plan year 1987-88, she received a salary of $40,000 for her work for the defendants in addition to the salary provided for in the employment agreement, and that the defendants failed to make a 10 percent mandatory contribution to the money purchase pension plan on the basis of that $40,000. The plaintiff did not testify as to the amount that she would have received in interest if the $33,000 had actually been contributed to the pension plan.

The jury returned a verdict in favor of the plaintiff on count one of the complaint in the amount of $26,500, representing damages for the defendants' wrongful termination of the pension plans. Thereafter, the defendants filed a motion for remittitur, claiming that the verdict on count one was excessive as a matter of law. The court agreed that the verdict was excessive and ordered a remittitur of $21,220. In its memorandum of decision, the court stated that "[i]n this case, the only damages which the jury could have found is the sum of $5280 in payment of federal taxes resulting from the defendants' breach of the agreement. The plaintiff's claim that the money she could have invested had the plans not been terminated would have reaped additional profits, was speculative, insufficient and not substantiated."

After reargument, the court reduced the order of remittitur to $17,220. The court found that in addition to the $5280 damages for payment of federal taxes, the jury reasonably could have awarded the plaintiff the sum of $4000, representing the amount equal to 10 percent of the plaintiff's $40,000 salary that the defendants were obligated to contribute to the money purchase pension plan in 1988. The court, however, reaffirmed its conclusion that the jury award was excessive, stating that "there was no credible evidence of damages resulting from the defendants' failure to fund the pen-

sion and profit sharing plans on the theory that had the plans not been terminated, the plaintiff would have reaped additional profits." Because of the absence of such evidence, the court concluded that the amount of $26,500 was excessive.

"When a verdict is excessive as a matter of law, the amount of the remittitur, which the statutes, General Statutes §§ 52-216a and 52-228b, require to be ordered before a new trial may be had, rests largely within the discretion of the trial court. 'Its action is entitled to full support unless it abused its discretion.' *Allen* v. *Giuliano*, 144 Conn. 573, 578, 135 A.2d 904 (1957). 'In determining whether the trial court abused its discretion, we must make every reasonable presumption in favor of the correctness of its action.' *Brooks* v. *Singer*, 147 Conn. 719, 720, 158 A.2d 745 (1960)." *Alfano* v. *Insurance Center of Torrington*, 203 Conn. 607, 614, 525 A.2d 1338 (1987); *Preston* v. *Phelps Dodge Copper Products Co.*, 35 Conn. App. 850, 864, 647 A.2d 364 (1994). "[A] jury's determination of damages should be set aside only when the verdict is clearly exorbitant and excessive; *Wochek* v. *Foley*, [193 Conn. 582, 586, 477 A.2d 1015 (1984)]; or the size of the verdict is so shocking to a sense of justice that it leads us to the conclusion that the jury was influenced by prejudice, partiality, mistake or corruption." *Sciola* v. *Shernow*, 22 Conn. App. 351, 357, 577 A.2d 1081, cert. denied, 216 Conn. 815, 580 A.2d 60 (1990).

The crux of the plaintiff's claim is that the court improperly determined that her claim for damages was speculative and unsubstantiated. She claims that she presented sufficient evidence to show that there would have been growth on the $33,000 that should have been contributed to the plans.

After a thorough review of the transcripts and exhibits, we conclude that the plaintiff presented no proof

as to the amount of return the $33,000 would have produced had the plaintiff been able to contribute it to the plans and subsequently roll it into her IRA. A review of the transcripts shows that on two occasions when the plaintiff attempted to introduce testimony as to how much the $33,000 would have increased in her IRA account along with the rolled over funds, the court sustained defense counsel's objections to this testimony on grounds that it was speculative. The plaintiff did not object to the rulings. Thus, there is nothing in the record to substantiate the plaintiff's claim. On the basis of this record, we conclude that the court correctly determined that the damages were excessive as a matter of law and ordered the remittitur.

### III

The plaintiff's final claim is that the court improperly instructed the jury as to her claim for medical benefits. We disagree.

The plaintiff's complaint alleged in count two that the defendants agreed to provide the plaintiff with the same level of medical benefits as were provided to her prior to the execution of her agreement with the defendants, and that prior to that agreement she had comprehensive, full coverage for all maladies, illnesses and injuries without exception. The plaintiff claims that medical and dental bills of $19,737.51 should have been paid by the defendants. The jury awarded the plaintiff $2670, which she claims is the result of a confusing charge to the jury that led to a reduced verdict.

The plaintiff sought payment of $6825 for dental bills that included fillings, bonding, prophylaxis, X rays, two crowns and removal of impacted wisdom teeth. She also sought payment of $12,912.51 for a mammography, breast reduction surgery, removal of a mole from one of her breasts and a biopsy following the surgery. The total amount claimed was $19,737.51.

The agreement of the parties states that the "[the plaintiff] shall be provided with the same level of medical benefits as previously provided by PENTEC, INC., at no cost to her. Reimbursement for or insurance premiums for medical benefits shall be in addition to the compensation" provided by the agreement. At the time the agreement was signed, PenTec, Inc., had a medical reimbursement plan dating from 1982, allowing the corporation the option to change the benefits covered by the plan. In 1983, the plan was amended to provide a $500 cap on reimbursements. In 1986, the plan was amended so that there was no limitation on the maximum amount of reimbursable benefits for that year, but reserving the right to the board of directors to further amend the plan. The resolution containing this amendment was signed by the plaintiff as secretary. Effective April 1, 1989, the plan was again amended to provide for a maximum reimbursement for medical expenses of $5000. On June 15, 1990, another amendment excluded orthodontic expenses, root canals and cosmetic, experimental or other nonrequired medical expenses. The medical insurance provided for by PenTec, Inc., as of 1997 excepted reconstructive cosmetic surgery. The defendants' special defense was that the medical reimbursement plan, as of the time the plaintiff incurred the expenses, had been properly amended and that the plaintiff had been paid for the claims to which she was entitled.

The plaintiff, as secretary of the former and the new PenTec, Inc., both before and after signing the agreement with the defendants, signed two of the minutes of special meetings of the board of directors that made clear that both the new and the former PenTec, Inc., retained "the option to change the amount of benefits payable each year to participants and the benefits covered by the Plan."

The interpretation of the employment agreement, including whether the subsequent amendments to the plan were intended to be incorporated by reference into the plan is a question of law. When the intent of the parties can be determined within the four corners of a contract, a question of law arises. *Amodio* v. *Amodio*, 56 Conn. App. 459, 470, 743 A.2d 1135 (2000); see also *Issler* v. *Issler*, 250 Conn. 226, 235, 737 A.2d 383 (1999). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Issler* v. *Issler*, supra, 235, quoting *Pesino* v. *Atlantic Bank of New York*, 244 Conn. 85, 91, 709 A.2d 540 (1998).

"Generally, incorporation by reference of existing documents produces a single contract which includes the contents of the incorporated papers." *Randolph Construction Co.* v. *Kings East Corp.*, 165 Conn. 269, 275, 334 A.2d 464 (1973). When parties execute a contract that clearly refers to another document, there is an intent to make the terms and conditions of the other document a part of their agreement, as long as both parties are aware of the terms and conditions of the second document. Id., 275–76.

The agreement clearly incorporates the medical plans that were in existence prior to the date of the agreement. Those plans all provided that the corporation could amend the medical reimbursement plan. We conclude that the plaintiff's benefits were governed by the provisions of the plan as amended and in existence at the time she incurred the bills for cosmetic surgery and dental work. The proper questions for the jury, therefore, were whether the plaintiff followed the proper procedure for submission of the bills and what bills

should be paid in accordance with the plan in effect at the time.

The court charged the jury, allowing it to determine whether the right to amend the plan was part of the agreement.[5] We have concluded that as a matter of law, the right to amend was part of the agreement and that the jury should not have decided the issue.

Although the jury should not have decided the issue, its verdict accords with our conclusion, namely, that the plaintiff's agreement entitled her to the benefits as provided in the amended plan at the time the medical

[5] The court's charge was as follows: "With respect to the medical reimbursement plan, the plaintiff claims that she is entitled to payment of all claims for medical expenses without exception under the plan in existence prior to the employment agreement. This, she contends, includes all dental work and her breast reduction surgery. As to this allegation, the defendants have filed a pleading called a special defense. A special defense is a pleading that alleges facts that show that a plaintiff has no cause of action. In regard to special defenses, the [defendants bear] the burden of proof. They have the burden of proving every essential element of their special [defense] by a preponderance of the evidence. In this case, the defendants contend pursuant to the special defense that the medical plan was properly amended to exclude all but routine medical and dental work and all cosmetic surgery, claiming, therefore, that the plaintiff has been paid all claims to which she was entitled. It is for you to determine whether the intention of the parties was that the right to amend the medical reimbursement plan was included as a part of the employment agreement. The defendants have the burden of proving the allegations of their special defense. Therefore, if you find that the defendants have proven by a preponderance of the evidence that they did not wrongfully amend the medical plan, that is, that the dental bills were not—excuse me. Let me back up. Therefore, if you find that the defendants have proven by a preponderance of the evidence that they did not fail to pay the plaintiff's medical bills under the medical reimbursement plan or that the dental bills were not for routine work or that the plaintiff's breast reduction surgery was cosmetic, then you should find for the defendants on this issue.

"Let me read that again, if I can. Therefore, if you find that the defendants have proven by a preponderance of the evidence that they did not fail to pay proper claims of the plaintiff under the medical reimbursement plan— of the plaintiff under the medical reimbursement plan or that the dental bills were not for routine dental work or that the plaintiff's breast reduction surgery was cosmetic, then you should find for the defendants on this issue."

and dental services were rendered, rather than the benefits in the plan in existence at the time the agreement was signed.[6] The jury determined that the plaintiff should receive reimbursement in the amount of $2670, and there was evidence to support a verdict in that amount.

Although the charge was not as clear as it could have been, it allowed the jury to find that the defendants did fail to pay medical bills. The possibility of confusion arises, the plaintiff claims, because the charge stated that "if you find that the defendants have proven by a preponderance of the evidence that . . . the dental bills were not for routine dental work or that the plaintiff's breast reduction surgery was cosmetic, then you should find for the defendants on this issue." The charge preceding the quoted statement allowed the jury to first find whether the defendants had failed to pay appropriate medical bills. The quoted words could be construed to come into play only if the jury found that the defendants need not pay some of the bills, namely, those for nonroutine dental work and cosmetic surgery. The jury, by awarding the plaintiff reimbursement for the bills exclusive of nonroutine dental work and exclusive of cosmetic surgery, did not find for the defendants on this issue, as feared by the plaintiff.[7]

A charge to a jury must be considered in its entirety, and the test is whether it fairly presents the case to the

[6] There was evidence from which the jury could conclude that the plaintiff followed the proper procedure for submission of all of the bills and that the plaintiff used the same procedure for submitting all of the bills. If the jury had concluded that the plaintiff had not followed the proper procedure for submission of the bills, it would not have awarded her any reimbursement, and if it had concluded that her benefits entitled her to the reimbursement allowed by the plan in existence at the time she signed the agreement, it would have awarded her payment in full.

[7] It is unclear from the transcript whether the plaintiff excepted to the charge as given. It is clear, however, that the portion of the charge claimed to be misleading was reread to counsel at the request of the defendants' counsel, not the plaintiff's counsel.

jury in such a way that injustice is not done to either party under established rules of law. *Blanchette* v. *Barrett*, 229 Conn. 256, 280, 640 A.2d 74 (1994). We find no injustice here when the charge is read as a whole.

The judgment is affirmed.

In this opinion the other judges concurred.