[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: PETITION FOR ADMISSION TO THE CONNECTICUT BAR
The petitioner, Robert A. Pfeiffer, is a January 1997 graduate of the University of Connecticut School of Law. He filed an application for admission to the bar on December 31, 1996, and in February of 1997, he took the Connecticut Bar Examination and received a passing grade. On June 16, 1997, as a part of the application process, the petitioner had an informal character and fitness interview with Attorney Michael J. Whelton, a member of the respondent Committee, who then referred the petitioner's application to the New Haven County Standing Committee on Recommendations for Admission to the Connecticut Bar. In December of 1997, the Standing Committee unanimously recommended the petitioner's admission to the bar.
The Connecticut Bar Examining Committee then scheduled a formal character and fitness hearing which was held on May 20, 1998. On May 20, 1999, the panel of the Committee which heard the case issued an written opinion recommending against the petitioner's admission to the Bar.
It is that action of the respondent Committee which is the subject of the present petition. He argues that even given the great degree of deference to be accorded to the Committee's determination, the evidence CT Page 15386 before it could not possibly support a conclusion that he at that time lacked "present fitness to practice law," and he contends that the Committee's actions were arbitrary and capricious.
The parties agree that in reviewing the actions of the Committee, this court's role "is similar to the review afforded an administrative agency decision; as such, the Superior Court's role in reviewing a petition for admission is not that of fact finder. The trier of facts determines with finality the credibility of witnesses and the weight to be accorded their testimony." Scott v. State Bar Examining Committee, 220 Conn. 812,821-822 (1992). At such a hearing, the applicant has the burden of proving good moral character. Id. The question before this court, therefore, is whether the evidence presented to the respondent Committee provided that Committee with a reasonable basis for concluding that at the time it rendered its decision, the applicant lacked "present fitness to practice law." Scott, supra, 220 Conn. at 829.
The issues that gave rise to the concerns that led to the Committee's recommendation occurred well before the petitioner's law school experience and application for admission to the Bar. Prior to law school, the petitioner was in the construction business. He owned his own company, Pfeiffer Construction Services, Inc. (PCS) from January of 1985 to January 1992. From August of 1991 through April of 1996, he worked for a company known as APEX Construction, Inc. (APEX), a company owned by his former wife, Catherine A. Reddington. It is both his activities during these periods of time and the manner of his disclosure of these activities to the Committee that led to the recommendation against his admission.
The petitioner's application had disclosed seven civil judgments against him and numerous other law suits in which he or his company were named as parties. These included two divorce actions, a personal bankruptcy matter, several evictions and a plaintiff's personal injury matter. Although he did not disclose it in his original application, the petitioner later brought to the Committee's attention an additional personal injury action in which he had been a defendant and in which his insurance company had paid a settlement. The volume of litigation in which the petitioner had been involved, the nature of that litigation, and the sporadic manner in which information about the lawsuits had been disclosed, were all clearly items of some concern for the Committee.
The issue, however, that appears to have been at the heart of the Committee's recommendation against the petitioner's admission to the Bar concerned a New Haven Superior Court case called John Cullinan, et al v.Pfeiffer Construction, et al, Docket Number CV92-033 4703. Although he did not disclose this case in his original application, the petitioner CT Page 15387 included a description of it in a later amendment to the application, and he provided additional documentation concerning the case at his May, 1998 hearing before the Committee. The essence of Cullinan's claim in this case was that the petitioner had ceased making medical insurance payments for the named plaintiff and other employees of PCS, a failure which was not discovered until around the time that Cullinan's wife needed to be pre-approved for surgery in the fall of 1990 and learned that her medical insurance coverage had been canceled as a result of the petitioner's nonpayment of premiums. The Committee delved extensively into the facts surrounding this case and concluded that the petitioner's conduct called into question his fitness to practice law. It was also disturbed by what it concluded was the petitioner's lack of candor in the way he doled out information about this episode in his life over the course of the application process, and it determined that this lack of credibility cast strong doubt on his moral character and his fitness at that time to enter the practice of law.
The court has reviewed the voluminous transcript of the proceedings before the panel of the State Bar Examining Committee that heard petitioner's application for admission to the Bar. Based on those proceedings, the panel found, in pertinent part, as follows:
 On or about November 1, 1989, the applicant, who was then 34 years of age, was the president and sole stockholder of Pfeifer (sic) Construction Services, Inc. a/k/a Pfeifer (sic) Construction, hereinafter referred to as the company. It was the company's policy, at that time and prior thereto, to provide medical insurance coverage, at its expense, to its employees, and their dependents, after one year of employment. On or about September 1, 1990, the spouse of an employee of the company required surgery and that employee was informed by the company's medical insurance carrier that the company's group medical insurance coverage had been terminated some months earlier. The applicant admitted that he, as president and sole stockholder, unilaterally ceased paying the company's group medical insurance premiums for its employees on or about June 1, 1990. The applicant also admitted that at least nine employees, and their dependents, were affected by his decision to cease making the aforementioned premium payments. Based on the entire record before it, the panel finds that the applicant willfully violated Connecticut General Statutes § 38a-537 and § 38a-538, in multiple instances, by failing to notify each of the company's CT Page 15388 affected employees of the cancellation or discontinuation, as well as the continued coverage option, of their medical insurance coverage. The Panel further finds that the applicant willfully violated Connecticut General Statute § 31-71b, on numerous occasions, by failing to pay the group medical insurance premiums on behalf of the affected employees of the company which premiums were part of each such employees' weekly compensation or payment of wages. The Panel is cognizant of the fact that our state statutes provide for the imposition of monetary fines for the violation of the aforementioned statutes and that, pursuant to Connecticut General Statute § 31-71g. a violation of Connecticut General Statute § 31-71b can trigger the imposition of a term of imprisonment for each violation thereof. Thus, the Panel concludes that the applicant's actions in violating the aforementioned statutes constituted not only a course of conduct evidencing a disregard for the law and the rights of others but also fraudulent conduct and that the record is devoid of any credible evidence, submitted by the applicant, to rebut the presumptions contained in the Connecticut Bar Examining Committee Regulations, Article VI-11(ii) and (iii).
 The Panel also finds that the applicant's testimony of May 20, 1998, did evidence a lack of candor on his part. Connecticut Bar Examining Committee Regulations, Article VI-8. In an apparent attempt to mitigate his prior actions and the circumstances involving his violations of the aforementioned statutes, the applicant attempted to explain his actions by blaming the acts of other company employees as well as the state of the company's account receivables, for his conscious decisions to terminate the group medical insurance coverage of the company's affected employees and to intentionally not inform said employees of that decision. The Panel finds that, after viewing the demeanor of, and listening to the testimony of, the applicant and reviewing the transcript of his testimony under oath, these overall explanations lacked candor and credibility and were not sincere. Where an applicant places his credibility and candor into issue, in an apparent attempt to explain past conduct, "no moral character CT Page 15389 qualification for Bar membership is more important than truthfulness and candor".
 The Panel further finds that the applicant, pursuant to Connecticut Bar Examining Committee Regulations, Article VI-11(iv), provided false information on his written application submitted to the Connecticut Bar Examining Committee on December 31. 1996, in that his answer to question number 52 was incorrect and that his explanation for providing such false information was not credible. (Footnotes and Transcript citations omitted.)
A review of the record fully justifies the Committee panel's finding that, at a minimum, the petitioner had failed to make payments to his company's insurance carrier and that he had failed to give the required statutory written notice to employees informing them of the lapse in insurance. Moreover, he gave conflicting and inconsistent accounts to the Committee about whom he had notified orally and when he had notified them. Although he now attempts to characterize the changes in his accounts as efforts to be candid and to correct minor errors he had made in earlier testimony and presentations, these revisions gave the Committee ample reason to be concerned about his credibility. Although he blamed both his failure to make the payments ab initio, as well as his failure to give timely notice to his employees, on a variety of external circumstances, including alleged embezzlements by one or more employees, the Committee was unconvinced by his explanations and his inability to document the embezzlements and their precise role in the downfall of his company. The Committee was also justifiably disturbed by the petitioner's stated reasons for not notifying employees of the cancellation of their insurance, which included embarrassment, fear of losing employees if they knew about the insurance problem, and his reliance on the "day-by-day" nature of his business, which he thought might eventually turn the corner and come into enough money to make the payments at the last minute, thereby making it unnecessary to have to inform his employees of the danger in which they were about to find themselves. These factors further supported the Committee's conclusion that the petitioner's failure to notify the employees according to law was "fraudulent", that is, that he had acted with the purpose and intent of deceiving them in order to gain an unlawful advantage. This in turn supported its determination that the petitioner had not been honest when he answered in the negative an application question about whether he had ever been a defendant in a lawsuit alleging "fraud, misrepresentation or other improper conduct."
The petitioner challenges the Committee's determination that his conduct regarding the issues raised by the Cullinan case constituted a CT Page 15390 "course of conduct" "evidencing a disregard for the law and the rights of others". He attempts to characterize the failure to maintain his employees' insurance benefits not as a "course of conduct," but rather as a one time decision. By his own testimony, however, he has acknowledged that he kept postponing the decision to give his employees fair warning about what he was doing to their insurance coverage, hoping that they would not leave his employ and that he might somehow find the funds to pay the premiums. The Committee's conclusion that from the time when he knew that he could not afford to make payments until the time that the insurance actually lapsed, the petitioner had numerous opportunities to comply with the statute and honor the rights of his employees is surely supported by the evidence, and the Committee was therefore justified in finding that the petitioner's failure over the course of several weeks to act to protect his employees' rights represented a "course of conduct," rather than a single act. Moreover, in light of the requirements of Gen. Stats. § 38a-537, the record supports the Committee's conclusion that this course of conduct displayed a "disregard for the law and the rights of" his employees.
Having heard the testimony and reviewed the documents, the Committee concluded that the petitioner lacked good moral character and hence lacked present fitness to practice law. It recognized that the petitioner's handling of the insurance matter itself had occurred some nine years previously, and there is no reason to believe that it would have denied him admission to the bar based on that episode alone. It found the contradictions in his testimony and what seemed to be convenient memory lapses extremely troubling, however, and it seems to have been primarily his conduct during the application process, rather than the Cullinan matter itself, that led it to question petitioner's present fitness to practice law.
The Committee also viewed petitioner's handling of the insurance problem as fraudulent, and therefore also viewed his failure to answer in the affirmative a question which asked about his having been a defendant in an action alleging "fraud, misrepresentation or other improper conduct," as evidence of a lack of candor. The petitioner argues that he was never specifically charged with fraud in the civil suit against him or convicted of any crime involving fraud, but if "fraud" is "anything calculated to deceive another to his prejudice and accomplishing the purpose, whether it be an act, a word, silence, the suppression of the truth or other device contrary to the plain rules of common honesty"Ballentine's Law Dictionary (3rd ed., 1969), p. 496-497, the Committee's characterization is supported by the evidence presented to it, including petitioner's own testimony. Although, certainly, the mere failure to answer in the affirmative the question about whether he had ever been a defendant in an action alleging "fraud, misrepresentation or other CT Page 15391 improper conduct" would not alone have been a basis for denying admission to the Bar, it was a legitimate factor for the Committee to take into account in its overall assessment of the petitioner's moral character.
The petitioner cites numerous portions of the Transcript in which he gave answers to questions which, on their face, appear to be appropriate and exculpatory. The Committee has made it clear, however, that the petitioner's demeanor, as well as the substance of his testimony, contributed to its conclusions regarding his moral character. For better or for worse, demeanor is an important, albeit highly subjective, factor in the assessment of credibility, and the court is not in a position either to second-guess the impressions of the five panel members who conducted this hearing or to disregard its conclusions. Whether the undersigned, or any other reviewer, might have reached a different conclusion upon all this evidence is not the issue before the court. The evidence before the Committee provided it with a reasonable basis for its concerns about the petitioner's candor, credibility and moral character. Given the Committee's responsibility to ensure the moral fitness of persons to be admitted to the Bar, such fact-based articulable doubts about a candidate's candor and credibility provided it with a sufficient basis to recommend against his admission to the Bar. The court is aware of the awesome authority and responsibility wielded by the respondent Committee and that the consequences of its action may be to prevent a person who has invested substantial economic and personal resources into his legal education from entering his chosen career. The court, unfortunately, has also had occasion to witness the enormous harm that can be inflicted both on individuals and on the integrity of the profession and the judicial system when persons who lack good moral character are permitted to practice law, and the committee also has the weighty responsibility of assuring that such persons are not admitted to the Bar. The consequences of the use of that authority and responsibility in this case are no doubt devastating to the petitioner, but the court cannot conclude that the Committee has exercised its power inappropriately. Applying the standard in Scott, supra, and with the possible exception to be noted below, there is no basis for setting aside the Committee's conclusion that, based on the evidence that had been presented to it, the petitioner lacked the present fitness to practice law at the time of the decision on his application.
One aspect of the Committee's written opinion, however, remains troubling. It specifically cited as one basis for its decision its belief that the petitioner had violated General Statutes § 31-71b. Specifically, it found that the petitioner's actions in failing to make the required insurance payments and failing to notify his employees of his failure to make them deprived them of "wages" within the meaning of this statute. Since the Committee's decision, however, the Appellate CT Page 15392 Court has decided Morales v. Pentec, Inc. et al, 57 Conn. App. 419
(2000), holding that payments of insurance premiums on behalf of employees are not the equivalent of "wages" within the meaning of this statute. Although it appears to the undersigned that it is likely that the Committee's decision was on based on its overall assessment of the petitioner's candor and credibility, rather than technical violations of this particular statute, the court is uncomfortable merely affirming the Committee's decision and dismissing the appeal without first ascertaining from the Committee whether a finding of a violation of this statute was necessary to its decision.
For this reason, the court remands the case to the panel of the Connecticut Bar Examining Committee that considered the petitioner's application with the direction to answer the following question: "In light of Morales v. Pentec, Inc. et al, 57 Conn. App. 419 (2000), is it the Committee's decision that, as of May 20, 1999, the petitioner then lacked the present fitness to practice law, even though his conduct with respect to the Cullinan matter was not a violation of General Statutes §31-71b?" If the answer to this question is in the affirmative, then the appeal will be dismissed; if the answer is in the negative, then the appeal will be sustained and judgment entered ordering the Committee to recommend that the petitioner be granted admission to the Bar of this state.
The court will retain jurisdiction over the matter, pending the filing of the respondent committee's answer to the above question. The Committee is ordered to file its answer no later than January 31, 2001. without prejudice to its right to request an extension of time if, for good cause shown, it is unable to meet this deadline.
Jonathan E. Silbert, Judge