JAY EDWARDS, INC., Plaintiff,
Appellee,

v.

NEW ENGLAND TOYOTA DISTRIBU-
TOR, INC., Defendant, Appellant.

No. 82–1539.

United States Court of Appeals,
First Circuit.

Argued Dec. 7, 1982.

Decided May 19, 1983.

Certiorari Denied Oct. 11, 1983.
See 104 S.Ct. 241.

Allen Kezsbom, New York City, with whom Steven Glickstein, and Kaye, Scholer, Fierman, Hays & Handler, New York City, were on brief, for defendant, appellant.

Daniel A. Laufer, Concord, N.H., with whom Myers & Laufer, Concord, N.H., was on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Jay Edwards, Inc. ("Edwards"), a New Hampshire Toyota dealership, brought this suit in February 1978 against New England Toyota Distributor, Inc. ("NET"), which at that time was the regional distributor for Toyota. Of the five counts in the original complaint, three were withdrawn by Edwards at the close of discovery. This left a claim under the Sherman Act, 15 U.S.C. § 1, and a pendent state statutory claim alleging bad faith conduct on the part of NET. At the close of the trial, the district court granted a directed verdict for NET on the federal claim. The state claim went to the jury, which returned a verdict for the plaintiff in the amount of $1,419,462, exactly the sum requested. With the addition of prejudgment interest, the award came to $1,849,459.37. NET's motion for judgment n.o.v., new trial, or remittitur was denied, and with new attorneys it appeals from both that denial and the judgment itself.

The claim that went to the jury was based on the New Hampshire equivalent of the federal Automobile Dealers' Day in Court Act. The New Hampshire statute prohibits a distributor from "engag[ing] in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of such parties or the public." N.H. Rev.Stat.Ann. § 357C:3(I). A distributor may not refuse to deliver reasonable quantities of cars to franchised dealers except for reasons beyond its control. Id. § 357C:3(III).

At trial, plaintiff presented evidence of a number of allegedly bad faith actions by NET. The most serious of these was an alleged malicious failure to supply Edwards with the number of cars to which it was entitled. Plaintiff also sought to show that NET had deceived it into withdrawing an objection to a competing franchise; that NET had wrongfully accused Edwards of misconduct in a sales promotion; that NET lied when it claimed a number of undelivered cars had been irreparably damaged in a storm; that NET knowingly filed a false complaint against Edwards with the state Attorney General; [1] and that NET had sent a letter terminating Edwards's franchise for reasons it knew were specious. Throughout this period Jay Edwards, plaintiff's president, was also president of the Toyota Dealer Alliance ("Alliance"), an organization of Toyota dealers unhappy with NET, formed to bargain with it. Plaintiff's theory at trial was that NET's harassment was in retaliation for Edwards's activity as president of the Alliance. It introduced evidence tending to show that other mem-

---

1. After an investigation, the Attorney General refused to take further action, finding that there was no evidence of significant illegal practices.

bers of the Alliance were also harassed by NET.

Plaintiff's damages claim, and its ultimate recovery, rested exclusively on the alleged misallocation of cars. Edwards claimed that beginning in April 1976, immediately after the Alliance had presented NET with a list of demands, NET disregarded its own allocation formula and "shorted" Edwards. From April 1976 through December 1977, Edwards was offered 527 fewer cars (300 per year) than was Bill Dube, Inc., a comparable New Hampshire dealership that theretofore had received identical allocations. Under Edwards's theory, it should have received what Dube had received. Edwards claimed the profits it purportedly lost because of NET's failure to allocate to it the same number of cars offered Dube. Edwards also sought damages for profits it purportedly lost *after* March 8, 1978, the date on which NET ceased to be the regional distributor. According to Edwards, the reduction in sales resulting from NET's machinations caused the new regional distributor to continue to allocate cars at an unjustifiably low rate.

Plaintiff's calculations of lost profits stemming from NET's shorting of cars were first presented in a 22-page document entitled "damage report" filed during pretrial procedures seven months before trial. The same calculations later went into evidence as plaintiff's exhibit 380. The financial records on which the calculations were based, though never introduced into evidence, had been available to NET during discovery. While NET moved before trial to eliminate other evidence proffered by plaintiff, NET did not object to the damage report, and the report was received into evidence without objection.

Edwards calculated damages as follows. First, it reduced the 300 vehicles it believed it should have been offered annually by its acceptance rate (the number of offered vehicles accepted) for each of the relevant years. It then calculated its gross per unit profit for each of the years by dividing the gross profits of the entire dealership by the number of new cars sold. It multiplied the per unit profit by the number of units (actual and hypothetical) it would have sold, then subtracted certain overhead costs. Some overhead items were assumed to be variable and correspond directly with sales volume (e.g., sales commissions); some were assumed to be semi-fixed (e.g., office supplies); and others were calculated as fixed (e.g., rent, owner's salary). This yielded a total net profit figure, from which was subtracted actual net profit to arrive at lost profits for each year.[2]

## I. STATUTORY VIOLATION

■ The thrust of this appeal is directed at the calculation of damages, not the finding of liability. NET denies that there were any deliberate misallocations, which, if strictly true, would preclude a finding of liability as well as damages. But the jury had before it evidence of troubled relations between Edwards and NET, of possible harassment by NET, and of a sudden and entirely unexplained disparity between the allocations to Edwards and those to Dube

**2.** For example, the figures for 1977, during which Edwards had an 89 percent acceptance rate, were as follows:

| | Actual (382 Cars) | Projected (649) | Increase |
|---|---|---|---|
| Gross Profit | $474,369/$1241 per unit | $805,928/$1241 | $331,559 |
| Selling Expense | 50,258/ 137 | 84,922/ 130 | 34,394 |
| Departmental Operating Expense | 154,185/ 403 | 199,158/ 306 | 44,973 |
| Overhead | 181,091/ 474 | 196,405/ 302 | 15,314 |
| Deductions | 1,948/ 5 | 1,948/ 3 | 0 |
| Net Profit | 86,617/ 226 | 323,495/ 498 | 236,878 |

immediately after the Alliance issued its list of demands. NET provided at trial no very clear explanation of the disparity in allocations.[3] Based on the evidence presented to it, it was open to the jury to conclude that NET had engaged in "action which is arbitrary, in bad faith, or unconscionable" and had failed to deliver "reasonable quantities" of automobiles in violation of subsections (I) and (III) of N.H.Rev.Stat.Ann. § 357C:3.

## II. DAMAGES

The picture as to damages is less clear. From April 1976 through March 1981 Edwards had total net profits of $210,287. It claims that, had it been offered an additional 300 cars per year, its net profits for that period would have been $1,629,749, and that it was accordingly damaged in the amount of $1,419,462. The jury agreed. Appellant strenuously attacks the size of this award, characterizing it as "totally out of proportion to any alleged wrongdoing by NET or any conceivable injury to the plaintiff."

Were we to write on a clean slate, we might find merit to NET's contentions. The award reflects annual profits proportionately far greater than Edwards ever made or than Dube achieved even with supposedly full allocations. Indeed, Edwards's own earnings history casts doubt on its estimates. For example, Edwards calculates that in the last nine months of 1976 it should have sold 354 cars (rather than 183), and that it would have earned $203,867 (rather than $28,242). Yet in 1977, when Edwards sold 382 cars, its net profit was only $86,000. The following year it sold 357 cars, almost the exact number estimated for the end of 1976, and made $56,000.

■ Mere generosity of an award, however, does not justify an appellate court in setting it aside, and we cannot say that the award here, for the period of NET's distributorship, exceeds "any rational appraisal or estimate of the damages that could be based upon evidence before the jury." *Glazer v. Glazer,* 374 F.2d 390, 413 (5th Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967); *see also Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 880 (7th Cir.1970) ("we must affirm unless the findings are beyond the pale of sane judgment"), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 584, 27 L.Ed.2d 632 (1971).

NET argues that Edwards's damages calculations relied so heavily on groundless assumptions and were so irrational that the jury should not have been allowed to use them. However, the calculations were introduced and described at trial without any objection from NET. At no time was it asserted that the data and suppositions therein—some of which are now attacked as without support in the record—were in fact entirely unsupported and hence inadmissible for the jury's consideration. Nor was it ever put to the judge, while the trial progressed, that plaintiff's damages calculations, all of which were gathered in a single exhibit, were too inaccurate, incorrect, or irrational, as a matter of law, to form the basis of a supportable jury award. *See Service Auto Supply Co. of Puerto Rico v. Harte & Co.,* 533 F.2d 23, 25 n. 3, 28 (1st Cir.1976). *See generally Local 901, International Brotherhood of Teamsters v. Compton,* 291 F.2d 793, 796–97 (1st Cir.1961).

■ An example of an argument barred by NET's failure to object below is its criticism that the gross per unit profit set forth in plaintiff's damages calculations was not the dealer mark-up on new cars, but instead was reached by dividing the *total* profits of the dealership—from sales of new and used cars, parts, and accessories, as well as service—by the number of new cars sold. The accuracy of this method obviously turns on

---

**3.** In an affidavit accompanying a motion for new trial, a former vice-president of NET put forward newly discovered computer printouts that he says do explain the disparity. We consider below whether this evidence was such as to compel the granting of a new trial. Here we point out only that the affiant states that "the discrepancy between the two dealers could not

be justified without resort to the actual numbers contained in these documents . . . . Plaintiff's contentions regarding misallocations . . . could not effectively be answered without this material." This only supports the rationality of the jury's conclusion—given the evidence presented to it—that NET, in bad faith, preferentially allocated cars to Dube.

whether income from parts, service, etc., rises in direct relation to new car sales. There was little evidence that this was so— although Jay Edwards testified that the two were related[4] and NET did not dispute it. NET now asserts that "[i]t is black letter law that there must be a *factual* basis for a witness' opinion and Mr. Edwards has wholly failed to provide one." Yet no objection was presented to the district court that the assumption of a one-to-one correlation as set out in plaintiff's damages exhibit lacked a sufficient factual predicate to be considered by the jury. Under these circumstances, we are unwilling to say, as a matter of law, that the jury was barred from awarding damages based on that assumption. *See Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 567 (2d Cir.1970). *Cf. Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510, 518 (10th Cir. 1976) (willing to assume that increased parts and service income would cover increased overhead expenses).[5]

■ NET also argues that plaintiff never proved that, under the prevailing formula, NET owed it 300 additional cars annually, or that plaintiff could have sold 300 additional cars annually. Both these assumptions were incorporated in the plaintiff's exhibit calculating damages and, as noted, there was never any objection that these or any other assumptions in the exhibit lacked a factual predicate sufficient to permit the jury to weigh the exhibit itself. Moreover, there was some, if sparse, evidence in support of each of the two propositions. While NET insists that Dube's higher allocations were the result of Dube's higher sales and lower inventories, there is not much in the record to indicate that this was in fact the

case, *see* Part I, *supra,* and the jury was entitled to infer the contrary. The only testimony, from Edwards, was that prior to April 1976, allocations and sales, and therefore inventory as well, were identical for the two dealerships. NET states, however, that even if it really did discriminate against Edwards in favor of Dube, then Edwards should have received 150 of the cars that went to Dube, thus equalizing their allocations. It relies on *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), for this proposition. But *McGeorge* is factually different—the evidence was clear that there was only a limited number of cars available and that allocations to three other dealers were artificially increased by cars that should have gone to McGeorge. Edwards's theory here, however, was that the allocations to Dube were correct and that, despite NET's denials, NET had surplus cars available with which it could have matched Dube's allocations, or else could have slightly reduced allocations to the other 71 New England dealers. Edwards's support for this proposition consists mainly of his own testimony, but we cannot say the evidence was so negligible as not to constitute a jury question.

NET also argues that even if Edwards had had more cars, it could not have sold them. It points out that Edwards turned down offered cars and at the close of every month had unsold cars on its lot. Jay Edwards offered his own explanation of why offered cars were rejected—essentially, some models were more popular and saleable than others. This was seemingly taken

---

4. We note that the bulk of plaintiff's evidence came from the testimony of Mr. Edwards. In particular, it was Edwards who, with the assistance of an accountant, prepared the damages calculations. In giving his opinion as to lost profits, Edwards was acting essentially as an expert witness. It is not unusual for an officer of a corporate plaintiff to testify as to lost profits, and such "evidence is ordinarily held adequate, without more, to make out a case." *See generally* R. Dunn, *Recovery of Damages for Lost Profits 2d* § 7.2 (1981) (collecting cases).

5. Plaintiff may also have been overgenerous to itself in its estimates of increases in overhead expenses resulting from increased volume. However, some deductions were made for overhead expenses. *Compare Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d 437 (1st Cir.1966) (remanding for new trial on damages where no deduction from gross profits made for expenses). *See generally Trabert & Hoeffer, Inc. v. Piaget Watch Co.,* 633 F.2d 477, 484 (7th Cir.1980).

into account in plaintiff's damages calculations by reducing the 300 car figure by the proportion of cars Edwards accepted from among those offered him by NET. Further, Edwards testified that he had sold every car he had ever taken. Certainly at any given moment, a dealer will have unsold cars on its lot. The jury could have believed this was simply inventory, which did not in itself indicate that the dealer was unable to make sales.

■ Appellant objects that there was no evidence of unfilled orders or potential customers being turned away. *Cf. Smith v. Babcock Poultry Farms, Inc.*, 469 F.2d 456 (10th Cir.1972). In a somewhat similar case where this court remanded for a new trial on damages, we commented among other things that the plaintiff had orders for only 25 of the 117 cars it claimed it should have received. *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437. That was not the basis of the new trial order there, however, and we cannot say that evidence of unfilled orders is essential, provided there is some other evidence from which a jury might rationally conclude the dealer would have sold extra cars if it had had them. Here there was testimony from Edwards and another dealer that they could have sold an additional 25 cars a month.[6] Moreover, Edwards did testify that a certain number of customers who had placed orders with him withdrew their deposits and purchased cars from Dube instead when Edwards was unable to fill their orders.

■ We conclude, taking into account plaintiff's unobjected-to damages exhibit, that there was a sufficient basis in the

evidence for the jury's award during the time NET was the regional distributor. Damages for lost profits need not be proved with mathematical certainty, provided an award has a rational basis in the evidence. *Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d 874 (1st Cir.1966). Moreover, where the defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about imprecision. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). As the Tenth Circuit stated in similar circumstances, "[g]iven a finding by the jury that [the distributor] discriminated in the allocation of cars, . . . [the distributor] is in an unfavorable position to complain of an uncertainty created by his own wrongdoing." *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d at 517.

■ Where plaintiff's testimony and calculations were admitted without objection, their accuracy was a matter for the trier of fact. *See Marquis v. Chrysler Corp.*, 577 F.2d 624, 638–39 (9th Cir.1978); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d at 566–67. Defendant's remedy was cross-examination, *see Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d at 446, and it "had every opportunity to cross examine [Edwards] and to expose to the jury any inconsistencies, inadequacies and inaccuracies in [his] testimony," *Kingsport Motors, Inc. v. Chrysler Motors Corp.*, 644 F.2d 566, 569 (6th Cir.1981). Indeed, it did so, pointing out forcefully during cross-examination and summation some of the questionable aspects of plaintiff's proof that have been argued before us. Moreover, NET could have presented witnesses and evidence of its own

---

**6.** Evidence of another dealer's performance is admissible. *See, e.g., Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 567 (2d Cir.1970); *Wilko of Nashua, Inc. v. TAP Realty, Inc.*, 117 N.H. 843, 379 A.2d 798 (1977). NET argues, however, that this testimony should have been excluded because there was no showing that the two dealerships were sufficiently similar for the comparison to be legitimate. NET's counsel did object to this brief testimony at trial, but only on the ground of relevancy. He did not specifically contend that the dealerships were geographically so distant as to make them incomparable, a possibility not necessarily ap-

parent. Unlike the situation in *Farmington Dowel Products Co. v. Forster Manufacturing Co.*, 421 F.2d 61, 82 & n. 48 (1st Cir.1970), here there was little evidence one way or the other as to comparability. Defendant's counsel, in his objection, brought none to the court's attention, nor did he pursue the matter on cross-examination. In these circumstances, we cannot find that the admission of this testimony was error; once admitted, its weight was for the jury to determine. *See* R. Dunn, *Recovery of Damages for Lost Profits 2d* § 5.8 at 234 (1981).

to indicate what the outer limits of Edwards's damages might have been. "It cannot now complain about the jury's reliance on the only evidence on damages which was presented." *Id.* at 569. Nor can it complain that that evidence was legally unacceptable when it did not raise that objection at trial. The jury's award for the period of NET's distributorship, though exceedingly generous, had a sufficient basis in the record.

### III. DAMAGES FOR PERIOD AFTER NET CEASED TO BE DISTRIBUTOR

■ Plaintiff calculated damages, and the jury awarded them, on the basis of an annual 300 car shortage for five years. That period included three years *after* NET had ceased being the distributor and thus had ceased to have any contact whatever with plaintiff. We conclude that to the extent the award was based on the period after March 8, 1978, it cannot stand. Not only is evidence of damage during this period almost nonexistent, but it stands on a different footing from the overall theory of damages in terms of objection at trial.

■ In contrast to its silent acceptance of the introduction of evidence of plaintiff's general theory of damages, defendant did object to this aspect of plaintiff's proof. On the final day of the trial it moved that "all testimony and exhibits introduced by the plaintiff relative to damages incurred subsequent to March 8, 1978 be stricken." The district judge denied the motion after brief oral argument at the close of evidence. Although the motion to strike might have been made earlier, *see, e.g., Holden v. United States,* 388 F.2d 240, 242–43 (1st Cir.), *cert. denied,* 393 U.S. 864, 89 S.Ct. 146, 21 L.Ed.2d 132 (1968), it was sufficiently timely to· allow the trial judge to consider whether this evidence could go to the jury and to preserve NET's rights on appeal.

■ A plaintiff must establish that the defendant's conduct caused the injury of which it complains. *E.g., Hangar One, Inc. v. Davis Associates, Inc.,* 121 N.H. 586, 590, 431 A.2d 792, 795 (1981). The link between misallocations by NET and those alleged to have occurred after NET left the picture is not obvious, for one would think that TMD, the new distributor, would be responsible for its own allocations. However, Edwards contends now, as it did to the jury, that because NET's willful misallocations reduced its sales, the allocation formula became skewed against it. As a result, incorrect allocations were built into the formula and continued long after NET was the one doing the allocating.

This theory is not necessarily implausible. Testimony at trial suggested that once a dealer's "travel rate" (i.e., his recent sales record) is depressed it may be difficult for him to regain his prior position. *See also Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.,* 14 Mass.App. 396, 440 N.E.2d 29, 35 n. 9 (Mass.App.1982). Assuming that NET did short Edwards cars, the effects could conceivably have been felt after TMD took over the distributorship. However, no evidence was introduced to show that TMD used the same formula as NET. Indeed, the evidence relative to this period was simply insufficient for a rational jury to ascertain that the volume of cars Edwards then obtained constituted a "misallocation" relative to what other comparable dealers were receiving. Significantly, during TMD's distributorship, Edwards's sales steadily *declined* from the level they had reached during NET's distributorship, while, with the exception of 1979, its acceptance rate rose every year, reaching 100 percent in 1981. TMD was thus offering Edwards fewer and fewer cars. Something else was clearly at work during these years besides any residual misallocations from the NET period. In light of the declining sales and allocations, the likelihood that at some point the formula would recover from prior shortages, and the general paucity of meaningful information as to what was happening to other dealers and in the market, we think the jury could not supportably have concluded that Edwards had during these three years continued to be shorted to the extent of 300 cars annually due to prior misconduct of NET.

Even assuming the jury could supportably infer the existence of *some* residual damages, Edwards had an affirmative burden, as plaintiff, to introduce evidence from which their amount could be approximated. *E.g., Kolb v. Goldring, Inc.,* 694 F.2d 869, 874 (1st Cir.1982); *Grant v. Town of Newton,* 117 N.H. 159, 162, 370 A.2d 285, 287 (1977). Instead, Edwards simply asked the jury to assume that the disparity between Dube and itself remained unchanged, that it was shorted 300 cars annually throughout this period, and that all this was somehow due to NET's prior wrongdoing. There is no evidence of what Dube's own actual allocations during this period were, nor does Edwards suggest any other benchmark against which its allocations can be evaluated. We think the claimed damages left, at this point, the realm of "just and reasonable inference" and entered that of "pure speculation or guesswork." *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1964).

Because the jury so clearly accepted plaintiff's damages calculations, the unjustified portion of the award is easily identified. There can be no dispute as to the amount of these damages: Edwards proved none. *See generally* 6A *Moore's Federal Practice* ¶ 59.08[7] (1983). Calculation of the excess is mechanical. Prorating the 1978 total for the period after March 8 and adding that amount to the figures for 1979–1981 gives a sum of $951,387.16, which we round down to $950,000. Accordingly, we order the award of damages reduced by that amount. We remand to the district court for recalculation of prejudgment interest on the remaining sum, the damages being deemed to have occurred between April 1976 and March 8, 1978.

## IV. EVIDENTIARY RULINGS

At trial, plaintiff introduced evidence that the brother of NET's chairman had been convicted of warranty fraud at his Chevrolet dealership and lost his Toyota dealership as a result. The asserted relevance of this evidence was that NET's patience with the brother was so much greater than with Edwards, who was sent a termination letter in circumstances far less grave, that it tended to show bad faith on the part of NET in its dealings with Edwards.

Had NET objected on grounds of prejudice, *see* Fed.R.Evid. 403, we might have questioned the admission of this evidence. The only stated ground of objection was relevancy, however; and we cannot say that the termination was completely irrelevant. As the objection failed to alert the trial court to the prejudice theory, we will not review that argument here. *See Bryant v. Consolidated Rail Corp.,* 672 F.2d 217, 220 (1st Cir.1982); *see generally Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.,* 676 F.2d 516, 573 (11th Cir.1982); 1 *Weinstein's Evidence* ¶ 103[02] at 103–21 to 103–22 (1982).

Appellant also claims that the district court admitted prejudicial hearsay testimony regarding the Federal Trade Commission's refusal to take action on a complaint lodged with it by the Alliance. Jay Edwards stated that an FTC employee had told the Alliance's lawyer, who had told Edwards, that the FTC was staying its hand because a private class action against NET was pending. NET's nonspecific objection at trial was overruled. It now asserts that this was inadmissible hearsay, and prejudicial in that it created the impression that 1) the FTC believed NET was guilty, and 2) that NET was in constant trouble with its dealers. We agree that, as an initial matter, the statement would not have been admissible. However, we conclude that it was cumulative and harmless. *See deMars v. Equitable Life Assurance Society of the United States,* 610 F.2d 55, 62 (1st Cir.1979). The day before Edwards gave the testimony of which NET complains, he gave substantially identical testimony, without objection, while being questioned by defense counsel. Moreover, as discussed below, there was extensive other evidence of poor relations between NET and its dealers.

NET also claims that the district court erred in admitting arguably prejudicial testimony and correspondence concerning disputes between NET and five other dealers. Four were directors of the Alliance (which seems to have had only a handful of directors) and the fifth a member. The court ruled at the pretrial conference that it would allow this evidence over NET's objection. The other dealers did not testify that they were shorted cars, but did describe harsh treatment by NET after formation of the Alliance and its protests against NET. Two Alliance directors were sent termination letters, subsequently withdrawn; NET commenced a warranty investigation of the third; and it sent a somewhat threatening letter objecting to the location of the fourth. (An identical letter, sent to the fifth dealer, was also introduced.) NET contends that this was impermissible evidence of other wrongs, see Fed.R.Evid. 404, and was in any event unduly prejudicial, see id. 403.[7]

We do not think this evidence simply portrayed unrelated "bad acts" (NET in fact denies that the conduct was improper at all). See Advisory Committee Notes to Rule 404(b). Rather, by suggesting a pattern of retaliatory practices against Alliance members, it was probative of NET's motive and intent, and its possible bad faith, in dealings with Edwards. See Bob Maxfield Motors, Inc. v. American Motors Corp., 637 F.2d 1033, 1039 (5th Cir.) (misallocation), cert. denied, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); Miller v. Poretsky, 595 F.2d 780, 784–85 (D.C.Cir. 1978) (evidence of past racial discrimination by defendant landlord admissible in Fair Housing Act action); id. at 790–91 & n. 12 (Robinson, J., concurring). The district court was entitled to conclude, without abusing its discretion, that the permissible probative value of the evidence outweighed

any prejudice. See generally Dente v. Riddell, Inc., 664 F.2d 1, 5 (1st Cir.1981).

Finally, the district court refused to allow NET to introduce evidence from its own records that Dube's and Edwards's sales for January through March of 1976 were not as close as Edwards claimed. That evidence, as the court said, was "basic and critical ... in explaining and justifying [NET's] allocations to its dealers." The court held, however, that these records should have been produced during discovery and could not be sprung on the plaintiff at the last minute. The court did not abuse its discretion in excluding this evidence. The parties had entered into a pretrial agreement as to the exhibits they were to present. The agreement did not include this evidence. It was within the discretion of the district court to hold the parties to compliance with the pretrial stipulation. See Newman v. A.E. Staley Manufacturing Co., 648 F.2d 330, 333 (5th Cir.1981); United States v. Rayco, Inc., 616 F.2d 462, 464 (10th Cir.1980); Simonsen v. Barlo Plastics Co., 551 F.2d 469, 471 & n. 3 (1st Cir.1977).

## V. MOTION FOR NEW TRIAL

Except with respect to the damages awarded for the period after March 8, 1978, the verdict was not so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice requiring a new trial. "The authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court," Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam), and we cannot say that discretion was abused here. See Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 200 (1st Cir.1980).

NET's motion for a new trial was based not only on the arguments already considered but also on newly discovered evi-

---

7. Appellee argues that NET stated its objection as "relevance" during the pretrial conference and therefore waived any other argument. A fair reading of the transcript, however, refutes this contention. NET's counsel stated that the proffered evidence was "an effort to prove that defendants did something by showing that they did the same alleged activities to someone else, which is normally not permitted except in narrow areas." Defendant's motion in limine contended that "experiences of other dealers are not relevant, and reference to them is designed to invoke an improper inference regarding defendant's treatment of the plaintiff."

dence and an accompanying affidavit from a former NET vice-president. The affiant stated that when NET lost its distributorship it ceased operations, its records were dispersed, and many of its personnel took employment elsewhere, making it impossible to track down all the relevant documents. Following the return of the large verdict against NET, the affiant was roused to action and was able to find computer sheets showing that the allocations to Dube and Edwards were in fact equivalent in that each dealer was provided with a more or less equal days' supply of cars. Because Dube's inventory was lower and sales rate higher, allocations to it were greater. The affiant is "convinced that the information contained in the documents in question conclusively answers the plaintiff's contentions regarding misallocations, and that such contentions could not effectively be answered without this material."

A motion for new trial on the ground of newly discovered evidence will generally be granted only where the movant was excusably ignorant of the facts despite exercising due diligence to uncover them. *See generally* 11 Wright & Miller, *Federal Practice and Procedure* § 2808 (1973). We cannot be impressed by the diligence of a party that fails to uncover evidence during four years of discovery that it manages to retrieve four weeks after losing the lawsuit. Moreover, this is not significantly new evidence. Allocations were based on sales and inventory. Both these figures appear in the financial records of the dealerships and so were, or should have been, known at the time of trial. In addition, the sales records, at least, were available in NET's records. *See* page 824, *supra*. Thus, appellant now seeks to rely on information that has been available to it all along by presenting it in a new format.[8] Indeed, appellant explicitly argues that other materials, known at the time of trial, prove that the allocations were proper. Thus, the computer printouts, according to

appellant, reveal nothing not already known. This is not the sort of "newly discovered" evidence that requires a new trial. *See Owens v. International Paper Co.,* 528 F.2d 606, 611 (5th Cir.1976).

*The judgment is reduced by the sum of $950,000 and, as so reduced, is affirmed. The case is remanded for recalculation of prejudgment interest consistent herewith.*

---

8. Armed with the sales and inventory figures from the financial records of the dealerships, counsel might perhaps have been able to calculate what the allocations should have been under the NET formula. If so, it could have presented the jury with exactly the sort of evidence on the basis of which it seeks a new trial.