[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR FOR REMITTITUR
Shell Oil Products Company ("Shell") has moved for judgment notwithstanding the verdict and/or for remittitur with respect to the jury's $1,351,836.00 verdict rendered on November 2, 2001 on Count One (breach of contract) of Plaintiffs Amended Complaint dated September 17, 2001 on the grounds that Message Center Management, Inc. ("MCM") is only entitled to nominal damages because it failed to prove that it suffered lost profits to a reasonable certainty.
Procedural History
On November 2, 2001, the jury rendered a $1,351,836.00 verdict in favor of MCM against Shell on Count One (breach of contract) of MCM's Amended Complaint dated September 17, 2001. The foundation of this award of damages on MCM's lost profits claim was the testimony of Maria Scotti ("Ms. Scotti") that MCM would have procured 38 tenant license agreements on behalf of Shell had Shell not terminated the National Management Agreement. CT Page 4084
Prior to the foregoing verdict and at the close of MCM's case in chief, Shell filed a written Motion for Directed Verdict dated October 17, 2001. In its Motion, Shell submitted, inter alia, that "[e]ven assuming arguendo that MCM prevails on liability, MCM is entitled to, at most, nominal damages pursuant to any of its claims because it has failed to prove that it has suffered lost profits to a reasonable certainty." Specifically, Shell submitted that: (a) the testimony of Ms. Scotti failed to satisfy the standard for admissibility of expert testimony on lost profits pursuant to Connecticut law; (b) MCM did not establish a concrete history of profitability; and (c) MCM did not present competent evidence concerning its expenses relating to its performance under the NMA and accordingly has failed to prove its lost net profits.
After hearing oral argument on Shell's Motion for Directed Verdict, the court reserved judgment on Shell's Motion until after the jury's verdict. Shell has now renewed the foregoing arguments set forth in its Motion for Directed Verdict and has asked the court to set aside the jury's verdict and any judgment rendered pursuant thereto, and enter judgment in favor of MCM only in the amount of $1.
Factual Background
MCM was incorporated in 1989 by Henry Zachs for the purpose of managing properties that he owned or leased that contained telecommunications equipment. Soon after forming MCM Henry Zachs expanded MCM's business to managing properties owned by other and marketing those properties to telecommunications caters who would lease space on those properties in order to expand their networks of telecommunications towers. Prior to the 1994-1995 period the majority of MCM's business related to pagers. MCM had only one office in Hartford, Connecticut.
Maria Scot, the office manager and a director of MCM began working for MCM in 1993. Her education consisted of high school and degree from Catherine Gibbs secretarial school. Her only experience in the wireless communications industry arises from her work at MCM where her job has consisted of dealing with the Federal Communications Commission (FCC), finding locations for telecommunications equipment, negotiating management agreements with property owners and negotiating leases with telecommunications carriers.
In 1994-95 personal communications services or PCS came on the scene in the wireless communications industry. PCS technology differed from the existing cellular telephone technology in that PCS sound transmission was clearer. PCS transmitted with a smaller but stronger signal. PCS signal was digital which allowed for the transmission of high speed data and a CT Page 4085 PCS phone could be smaller since the signal was so strong.
The defendant Shell has its principal place of business in Houston, Texas. Shell's primary business is the sale of petroleum products. However in 1995 Shell was interested in using its many gasoline service stations to generate income in addition to the income it earned from the sale of petroleum products.
In 1995 MCM approached Shell to determine whether Shell had any interest in leasing its signs or other structure on its properties for use by wireless communications caters. In 1995 and early 1996 Shell and MCM entered into three contracts whereby MCM would market Shell properties to wireless communications caters to lease antenna space. The first contract was for 429 Shell properties in the New England region ("New England Agreement"). The second contract was for 218 properties in the Southeast Florida region ("Florida Agreement"). The third contract was for Shell's remaining 3, 529 properties in the United States ("National Agreement"). The National Agreement is the subject of this action.
In April 1996 MCM and Shell entered into the National Management Agreement. That Agreement was amended in August of 1996. The provisions of the Agreement which are pertinent to the MCM's claim for breach of contract as follows:
15. TERM:
 a. The commencement of this Agreement is as of the date of execution. This Agreement shall remain in effect for five (5) years from the date of execution, and shall be extended on a year to year basis unless either party furnishes notice to the other within 180 days of the expiration of the five (5) year term or any one year extension thereafter.
 b. Owner shall also have the right to terminate this Agreement, with respect to any one or more Sites, on a Site-by-Site basis, upon 180 days prior written notice to Manager. If, at the effective date of termination, any Tenant License Agreements, previously approved by Owner, are still in effect, and only in that event, then such Tenant License Agreements shall continue until the end of their terms, and Owner and Manager shall continue to apply the terms and provisions of this Agreement to the affected Site until all such tenant License Agreements have expired or are otherwise properly terminated.
By May of 1997 MCM had not generated any leases with any carriers for Shell's properties under the National Management Agreement. Therefore, on CT Page 4086 May 20, 1997 Shell sent a notice of termination of the National Management Agreement to MCM, based on MCM's failure to perform satisfactorily under the terms of the National Management Agreement. The notice indicated that the National Management Agreement would end as of December 1, 1997. During the approximately 20 months in which the National Management Agreement remained in effect the only lease obtained by MCM on the national properties was one in California and resulted from Shell referring the cater to MCM rather than from any marketing efforts on the part of MCM.
 Discussion of the Law and Ruling
Practice Book § 16-37 provides:
 Whenever a motion for directed verdict made at any time after the close of the plaintiffs case in chief is denied or for any reason is not granted, the judicial authority is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. . . . After the acceptance of a verdict and within the time stated in Section 16-35 for filing a motion to set a verdict aside, a party who has moved for a directed verdict may move to have the verdict and any judgment rendered thereon set aside and have judgment rendered in accordance with his or her motion for a directed verdict. . . . If a verdict was returned, the judicial authority may allow the judgment to stand or may set the verdict aside and either order a new trial or direct the entry of judgment as if the requested verdict had been directed.
A directed verdict is appropriate "where the decisive question is one of law or where the claim is that there is insufficient evidence to sustain a favorable verdict." McNeff v. Vinco, Inc., 59 Conn. App. 698,702-03, 757 A.2d 685 (2000) (quoting Morales v. Pen Tec, Inc.,57 Conn. App. 419, 425, 749 A.2d 47 (2000)). With respect to claims of insufficient evidence, "[a] directed verdict is justified if on the evidence the jury reasonably and legally could not have reached any other conclusion." Gagne v. Vaccaro, 255 Conn. 390, 400, 766 A.2d 416 (2001); see also Berry v. Loiseau, 223 Conn. 786, 819-20, 614 A.2d 414 (1992) (citations omitted); Petrizzio v. Commercial Contractors Corporation,152 Conn. 491, 208 A.2d 748 (1965) ("[for the attack on the court's refusal to set aside the verdict to succeed, it must appear that the evidence furnished no reasonable basis for the jury's conclusion . . .") While, in considering a motion for directed verdict, the court must view the evidence in the light most favorable to the plaintiff, and while the jury is entitled to draw deductions and reasonable inferences from the facts proven, the jury may not be allowed to "resort to mere conjecture and speculation." Gagne, 255 Conn. at 400. Accordingly, "if the evidence CT Page 4087 would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury." Krondes v. Norwalk Sav.Soc., 53 Conn. App. 102, 112, 728 A.2d 1103 (1999) (quoting DiDomizio v.Frankel, 44 Conn. App. 597, 600, 691 A.2d 594 (1997)).
With respect to remittitur, Conn. Gen. Stat. § 52-228b authorizes a Court to set aside a verdict of money damages on "written motion by a party to the action, stating the reasons relied upon in its support." When considering whether remittitur is appropriate, the Court must be guided by "a fair appraisal of compensatory damages, and not the limit of legitimate generosity . . ." Fronczek v. Della Bitta-Bassola, Inc.,165 Conn. 102, 104, 328 A.2d 680 (1973). In this regard, "[a] jury's determination of damages should be set aside only when the verdict is clearly exorbitant and excessive; or the size of the verdict is so shocking to a sense of justice that it leads . . . to the conclusion that the jury was influenced by prejudice, partiality, mistake or corruption."Morales v. Pentec, Inc., 57 Conn. App. 419, 435, 749 A.2d 47 (2000); seealso Damato v. Thompson, 64 Conn. App. 479, ___ A.2d ___ (2001) (stating general rule). "Where the court orders the verdict set aside unless a remittitur is filed, that action will not be disturbed unless the broad legal discretion vested in the trial court was abused." Fronczek,165 Conn. at 103.
The jury found that Shell breached the National Management Agreement when it terminated that Agreement prior to the end of the initial five year term. The defendant does not claim that there was no evidence to support such a finding. The jury could have, and obviously did, construe paragraph 15a of the National Management Agreement to provide that Shell was required to wait for five years before terminating the Agreement. Shell's Motion is based on the claim that the damages evidence was too speculative to permit the award of any lost profits. The court agrees for the reasons set forth below.
The National Management Agreement provides that it "shall be construed in accordance with the laws of the state of Delaware." National Management Agreement ¶ 21. Under Delaware law, as under Connecticut law, lost profits are only recoverable if they can be proven to a reasonable certainty. American General Corp. v. Continental AirlinesCorp., 662 A.2d 1, 12 (Del.Ch. 1992) (stating that "[a]n award of damages may not be based on `speculation or guesswork'"); Callahan v.Rafail, No. Civ. A. 99C-02-024, 2001 WL 283012, *1 (Del.Super.Ct. March 16, 2001) ("[A] recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative."); Ronald RE v.Gannett Co, Inc., 480 A.2d 662, 668 (Del.Super.Ct. 1984) ("Courts have CT Page 4088 required that loss of future profits be established by substantial evidence and not be left to speculation."). The rule that lost profits may be recovered only if proven to a reasonable certainty has been widely adopted, including in Connecticut. See Beverly Hills Concepts v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48, 717 A.2d 724, 733-34 (1998); 22 Am.Jur.2d Damages § 625 (1988) ("lost profits will be allowed only if their loss is proved with a reasonable degree of certainty."); 3 Restatement (Second) of Contracts § 352 ("[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").
Shell claims that MCM is only entitled to nominal damages in this case because it failed to prove its lost profits damages to a reasonable certainty for each of the following reasons: (a) Ms. Scotti's testimony failed to satisfy the standard for admissibility of expert testimony on lost profits pursuant to Connecticut law; (b) MCM did not establish a concrete history of profitability; and (c) MCM did not present competent evidence concerning its expenses relating to its performance under the NMA, and accordingly, has failed to prove its lost net profits. Therefore, Shell argues, the jury had no reasonable basis for its award of actual damages to MCM and its verdict should be set aside.
The party seeking to introduce expert testimony bears the burden of establishing the admissibility of that testimony. State v. Porter,241 Conn. 57, 87, 698 A.2d 739 (1997) ("[o]nce the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility") (quoting E.I. du Pont de Nemours Co. v. Robinson,923 S.W.2d 549, 557 (Tex. 1995)). In Porter, the Supreme Court of Connecticut adopted the test for determining the admissibility of expert scientific testimony set forth in Daubert v. Merrell DowPharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993). Porter,241 Conn. at 68. By adopting Dauber the Court found that trial courts should serve as a gatekeeper for scientific evidence. Porter, 241 Conn. at 74. One court has stated in summary of the Daubert factors that, in performing this function, "[t]he court may admit proffered expert testimony only if the proponent demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." American Tourmaline Fields v. International Paper Co., No. 3:96CV3363d 1999 WL 242690 *2 (N.D.Tex. April 19, 1999) (footnotes omitted); see also Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137,1198. Ct. 1167, 1174 (1999); Daubert 113 S.Ct. at 2786 ("expert's testimony [must] both rest on a reliable foundation and [be] relevant to the task at hand."); Porter at 64 ("In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant."); Drea v. Silverman,55 Conn. App. 107, 110, 737 A.2d 990 (1999) ("[t]o admit an expert CT Page 4089 witness' opinion, `[t]he witness must be qualified to express the opinion the question calls for, and adequate facts upon which [the opinion] is based must be proved.'") (quoting Graybill v. Plant, 138 Conn. 397, 403,85 A.2d 238 (1951)); Tait's Handbook of Connecticut Evidence, § 7.5.5 (3d ed. 2001) ("No opinion, lay or expert, can be based on conjecture or surmise. To avoid speculation, opinions and conclusions must be `reasonably probable' and not merely `possible.'") (internal citations omitted).
In addition, the Supreme Court in Daubert:
 listed four nonexclusive factors for . . . judges to consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community.
Porter, 241 Conn. at 64 (citing Daubert, 509 U.S. at 593-594). In addition to these four factors, "[s]everal courts have also considered whether the scientific technique underlying the proffered expert testimony was developed and implemented solely to develop evidence for in-court use, or whether the technique has been developed for extrajudicial purposes." Porter, 241 Conn. at 86.
In Kumho Tire, the United States Supreme Court extended the Daubert
analysis to apply to all types of expert testimony rather than to just scientific evidence. Kumho Tire, 119 S.Ct. at 1174. In so holding, the Court reasoned that there was not "a convincing need to make such distinctions . . . [because] experts of all kinds tie observations to conclusions through the use of `general truths derived from . . . specialized knowledge.'" Id. While no Connecticut appellate court has expressly adopted or rejected Kumho Tire, its reasoning is sound and it has been cited favorably by other Connecticut superior courts. See Ramosv. Town of Branford, No. 407617, 1999 WL 1288984 (Conn.Super.Ct. Dec. 17, 1999) (Blue, J.); Robillard v. Asahi Chemical, No. X1 CV 94-014579, 1999 WL 785871 (Conn.Super.Ct. Sept. 14, 1999) (Hodgson, J.).
Even without reference to Daubert, Porter, or Kumho Tire, Connecticut law requires the court to exclude evidence which is speculative. In Heathv. Commissioner of Transportation, 175 Conn. 384, 391-92, 398 A.2d 1192
(1978), the Court upheld the trial court's determination that a sketch produced by an expert purporting to show the cost of developing a parcel of land was too speculative to warrant admission, because the evidence CT Page 4090 focused on one particular use of the land, when various generalized industrial uses were possible. See also Graybill v. Plant, 138 Conn. 397,404, 85 A.2d 238 (1951) (exclusion of testimony of witness' "impression" concerning salary paid to decedent's secretary, when witness also testified that he did not remember).
The primary deficit in the plaintiffs lost profits evidence was its failure to reference MCM's own actual experience. MCM was not a start-up company. It had been in business for years, had tax returns and profit and loss statements. The plaintiff failed to introduce any of those documents. However, when some of them were introduced by the defendant, the variation between reality and the plaintiffs evidence was striking.
Under the law in Connecticut, Delaware and many other states an owner of a business is permitted to give an opinion as to the business's anticipated lost profits cause by the defendant's breach of contract. In its Memorandum in Opposition to the Motion for Judgment Notwithstanding the Verdict the plaintiff has relied upon R. Dunn, Recovery of Damagesfor Lost Profits, § 7.2 at 340-41 (3rd ed. 1989). That treatise cites cases from many states including Jay Edwards v. New England ToyotaDistributor, 708 F.2d 814 (1st Cir. 1983); Tull v. Gundersons, Inc.,709 P.2d 940 (Cob 1985); Alaska Children's Services, Inc. v. Smart,677 P.2d 899 (Alaska 1984); and Cates v. Morgan Portable Bldg. Corp.,591 F.2d 17 (7th Cir. 1979). However in the foregoing cases the owner's testimony was based on evidence of his business's actual past lost profits.
MCM has cited Westport Taxi Service, Inc. v Westport Transit District,235 Conn. 1, 664 A.2d 719 (1995) for the proposition that Ms. Scotti could properly testify that MCM would have procured 38 leases had Shell not terminated the NMA. Westport Taxi is not analogous. In WestportTaxi, the owner of a taxi business was allowed to testify about the value of his business "based on his own experience in the taxi business for more than twenty years, his knowledge of how a taxi business was valued by the industry, his discussions with other owners, his knowledge of other sales, his membership in the Connecticut Taxi Cab Association, his membership in the International Taxi Cab Association, and finally, his own personal experience and practice in the 1960s and 1970s. . . ." Id. at 34-35. The Supreme Court of Connecticut, in upholding the trial court's ruling, found that "[i]t is well settled that the owner of property is competent to testify to its value." Id. at 35.
In Westport Taxi, the owner of a taxi business was found to be qualified on the topic of the valuation of a taxi business, and was permitted to testify concerning the valuation of his taxi business despite the fact that he was not formally disclosed as an expert witness. CT Page 4091
Like Westport Taxi, the cases set forth above cited in the Dunn Treatise, Recovery of Damages for Lost Profits, support the position of Shell, rather than that of the plaintiff because the testimony about lost profits in all of those cases was based on evidence of the profit historyof the business in question. For example, in Tull v. Gundersons, Inc, supra, which involved a claim for breach of construction contract, the appellate court held that the trial court had improperly excluded evidence of the plaintiffs past profit experience on similar projects.
In Jay Edwards, supra, the evidence as to lost profits came from the plaintiffs testimony about the net profits of his automobile dealership for five years prior to the breach of contract. Similarly, in Cates v.Morgan Portable Bldg. Corp, supra, the plaintiffs based their claim for lost profits on their evidence as to the net profits from their motel for five years prior to the date of the defendant's breach of contract.
In the present case the plaintiff introduced no evidence that MCM, which had been in business for many years, had any profits. Instead, MCM relied on Ms. Scotti to opine about future events when she was clearly unqualified to do so. For this reason prior to trial[1] and at the trial Shell objected strenuously to Ms. Scotti's qualifications as an expert. The court allowed her to testify because preventing her from doing so essentially would have terminated MCM's case[2], thereby requiring the parties to start from scratch in the trial process if the ruling prohibiting her testimony was later determined to be incorrect.
Although MCM's marketing effort failed to produce even one lease during the 20 months when the National Management Agreement was in effect, the foundation for MCM's lost profits damages claim was Maria Scotti's purported expert testimony that MCM would have procured 38 tenant license agreements on behalf of Shell had Shell not terminated the National Management Agreement. Ms. Scotti calculated this figure by first determining MCM's alleged success ratio or "penetration rate," which she accomplished by adding the 7 properties that MCM leased under the New England and South Florida Agreements — all of which were obtained in New England where MCM was based — and dividing that number by the 650 properties that MCM managed under the New England and South Florida Agreements — 432 of which were in New England and 218 of which were in South Florida. This calculation resulted in an alleged penetration rate of 1.08%. Ms. Scotti then applied this penetration rate to the 3,529 properties that MCM marketed under the National Management Agreement to achieve its figure of 38 pcs tenant license agreements that MCM would have procured for Shell under the National Management Agreement. This calculation along with various other assumptions, including Ms. Scotti's opinion that the average term of each tenant CT Page 4092 license agreement would have been 20 years, and her opinion as to expenses, served as the basis for MCM's lost profits damages claim of $2,703,672.00, as calculated by Arthur Haut, an accountant.
Ms. Scotti's purported lost profits opinions were based upon something called "statistical inferences." A statistical inference entails predicting an outcome based upon a sample of data. See Syed Imtiaz Abmad,Statistical Inferences and Creative Thinking, Int'l J. Sci. Tech., 10 (2) 11 (1, 2), pp. 5-18 (1999) Specifically, "[s]tatistics . . . provides us with the means to discover patterns in data, to draw inferences from data, and to predict the outcome of events." Id. In this regard, "[s]tatistics may be defined as the science of data." Id.
Ms. Scotti's damages testimony clearly constituted a statistical inference in that she predicted what MCM's success rate would have been nationally based upon data about how it performed in New England and in South Florida. Since Ms. Scotti's testimony was based upon such a statistical inference and statistics is considered a science, Ms. Scotti's testimony was subject to a Daubert/Porter analysis. Accordingly, Ms. Scotti must have been qualified as an expert in the field of statistics and her opinion testimony must have been reliable. The defendant established at trial that Ms. Scotti had no expertise, by virtue of education, experience or otherwise, in the field of statistics so as to satisfy the qualifications requirement of Daubert/Porter.
In this case, the issue was not the value of MCM's business or even the value of a lease, but rather a prediction about how many leases MCM would have procured in an area where it had no experience, based on its experience in New England and South Florida. Such a prediction necessarily involves an analysis of whether the New England and/or the South Florida experiences are valid points of comparison and whether the extremely limited data from these two areas (7 leases in New England and 0 in South Florida) was sufficiently reliable to serve as the basis for a nationwide extrapolation. As a result, Ms. Scotti, without any qualifications to do so, in effect performed a statistical inference calculation in determining the number of leases that MCM claimed that it would have procured had Shell not terminated the National Management Agreement.
Not only did Ms. Scotti lack the qualifications to opine as to statistical inferences, she offered no adequate basis for her opinion as to the 38 anticipated leases.. Ms. Scotti arrived at the figure of 38 leases by applying MCM's alleged combined success rate of 1.08% in New England — where MCM procured 7 leases out of 432 properties — and in South Florida — where MCM procured 0 leases out of 218 properties — to the 3,529 properties that MCM was authorized to CT Page 4093 market under the NMA. However, the plaintiff offered no proof that the circumstances surrounding MCM's experience in New England was sufficiently similar to the circumstances surrounding its performance in South Florida such that those experiences could be reasonably combined to accurately predict how MCM would have performed somewhere else. Moreover, neither Ms. Scotti nor MCM presented evidence that the circumstances surrounding MCM's experience in New England was sufficiently similar to the circumstances surrounding MCM's marketing of properties under the National Management Agreement such that the New England experience could accurately predict how MCM would have performed under the National Management Agreement. Using the New England experience to predict how MCM would have performed in other geographic areas was pure speculation.
MCM's relative success in New England versus its lack of success in South Florida can be explained by the fact that MCM was based in and had its only office in Connecticut, and employed full time employees who were located in Connecticut or elsewhere in New England. By virtue of this fact, in New England, MCM had a home court advantage in that it was able to and did visit nearby Shell properties with relative ease, had good access to and relationships with decision makers for wireless communications carriers located in New England and enjoyed other similar advantages of being based near the properties that it was marketing. Accordingly, MCM was able to lease 1.62% of the properties that it managed under the New England Agreement.
In contrast, MCM did not have an office or any employees in South Florida. Therefore, MCM enjoyed none of the home court advantages that it enjoyed in New England and it was unable to lease any of the 218 Shell properties that it managed under the South Florida Agreement. These facts show that it was completely unreasonable for Ms. Scotti to utilize the New England experience to predict how MCM would perform in any other geographic area. Rather, MCM's South Florida experience and its actual experience during the 20 months when the National Management Agreement remained in effect would provide the best indication of how MCM would have performed in other geographic areas where MCM similarly did not have an office or base of employees. Had Ms. Scotti based her opinion on MCM's performance in South Florida or nationally, then MCM would have had a 0 penetration rate, and, obviously, no lost profits from Shell's breach of contract. In sum, MCM did not present any factual or evidentiary basis which demonstrated that the New England or even the South Florida experience provided reasonable or reliable data for an extrapolation as to what might happen nationwide. The projection of 38 leases using those experiences was simply speculation.
Ms. Scotti's foundational testimony — that in the remaining CT Page 4094 months of the National Management Agreement MCM would have entered into 38 leases was itself based on impermissible speculation. In addition, her testimony as to the rate at which MCM would add leases was also based on speculation which was belied by MCM's actual experience. Ms. Scotti testified that the PCS business was going to really take off and that the number of tenant license agreements that MCM would procure for Shell would increase in each successive year such that it would obtain 3 in 1998, 10 in 1999, 12 in 2000 and 13 in 2001 until it reached 38 leases.
A company's actual performance has been found probative on the issue of "whether the plaintiff has proved lost profits to a reasonable certainty." See Beverly Hills Concepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48, 72-73, 717 A.2d 724 (1998) ("A plaintiffs prior experience in the same business has been held to be probative . . . as has a plaintiffs experience in the same enterprise subsequent to the interference."). In this case, the PCS business changed such that MCM, in marketing all of the properties in its portfolio, procured a lesser
amount of leases in each successive year between 1997 and 2000 — 13 in 1997, 10 in 1998, 6 in 1999 and 4 in 2000. This trend clearly shows that Ms. Scotti's opinion that MCM would have procured a higher number of tenant license agreements in each successive year until it reached a total of 38 was completely unsupported speculation.
Ms. Scotti added speculation to speculation when she opined that the average PCS license agreement would have lasted for twenty years. The following excerpt from the trial testimony indicates the speculative nature of Ms. Scotti's prediction that all of the predicted 38 PCS leases into which MCM would have entered would have lasted for twenty years:
Q Now, Ms. Scotti, isn't it true that PCS has only been around since 1995?
A That's correct. . . .
Q Ms. Scotti, isn't it true that we don't have any historical experience with PCS as to whether caters are going to — what caters are going to do beyond the 7 years that it has been in existence?
A Correct.
Q Ms. Scotti, would you agree that there's been a significant change in technologies in the wireless communications industry over the last 20 years? A Yes.
Q And is it fair to say that we don't really know what is going to happen with respect to wireless communication technology in the next 20 CT Page 4095 years as we sit here today?
A That's true. . . .
Q Ms. Scotti, isn't it true that over the last 20 years there have been antenna sites for wireless communications that were originally established for a particular technology but have become decommissioned or the antenna sites have been taken down or not renewed because of the changes in technology? . . .
A I'm sure there have been some towers that have been removed. . . .
Q Do you know what's going to happen with the PCS technology in the next 20 years as to whether it's still going to be used or not?
A No, I don't.
Under Delaware law, a party can only recover for lost profits where "there is concrete data of past profit history." Crowell Corp. v. HimontUSA, Inc., No. Civ. A. No. 86C-11-125, 1994 WI. 762663, *3 (Del.Super.Ct. Dec. 8, 1994); Ronald RE v. Gannett Co, Inc.,480 A.2d 662, 668
(Del.Super.Ct. 1984); see also T.D.S., Inc. v. Shelby Mut. Ins. Co.,760 F.2d 1520, 1532 n. 14 (11th Cir. 1985) (holding trial court properly refused jury instruction on lost profits where plaintiff showed no history of profitability for reasonable time prior to breach of contract sued upon); Niagara Therapy Mfg. Corp. v. Niagara Cyclo Massage, Inc.,196 So.2d 474, 476-77 (Fla.App.Ct. 1967) (jury instruction preventing recovery for lost profits was proper where no sufficient history of profit); Radlo of Georgia, Inc. v. Little, 199 S.E.2d 835, 837-38
(Ga.App.Ct. 1973) (no basis for judging future performance where plaintiff was not able to show profit during the seven (7) months in which he was in operation); Brenneman v. Auto — Teria, Inc., 491 P.2d 992,993-94 (Or. 1971) (plaintiff failed to prove lost profits claim where there was no history of past profits).
In Radlo of Georgia, Inc. v. Little, the plaintiff-pig farmer sued a pig distributor for terminating a contract with the farmer to raise pigs.Radlo, 199 S.E.2d at 835. The plaintiff sought lost profits based upon his claim that he would have been able to sell seven (7) to eight (8) pigs per litter, even though his average for the seven (7) previous months was 2.7. Radlo, 199 S.E.2d at 838. Using the 2.7 figure, the plaintiff was operating at a loss. Applying the foregoing rules, the Court held that the claimed damages were too remote to be recoverable. In so holding, the Court reasoned:
If the past performance of the plaintiff here be used as the CT Page 4096 criterion, he proved no loss of profits because he was operating at a loss. If it be not so taken, there is no basis for judging what his future performance might have been. His measure of damages for the defendant's breach, accordingly, could not be laid on this premise. . . .
Id. at 838.
In this case, MCM had been in business for years prior to Shell's breach of contract. Yet it introduced no evidence whatsoever about its history of profitability. Moreover, MCM's federal income tax returns[3], which were introduced by Shell, show that MCM had no profits in the two years prior to Shell's breach of contract. Specifically, MCM lost $11,313 in 1996 and lost even more money, $208,306, in 1997.
Damages for lost profits are based upon net profits rather than gross receipts. See Watson v. Berna, No. 8389, 1987 Del. Ch. Lexis 383, *7 (Feb. 11, 1987) (referring to net profits); Ripsom v. Beaver Blacktop,Inc., C.A. No. 83C-AU-128, 1988 Del. Super. Lexis 117, *40 (April 6, 1988) ("If you find that New Castle is entitled to lost profits, it is entitled only to its lost net profits."). "In other words, [a party] may not recover its fixed overhead costs, such as rent, administrative salaries, real estate taxes and insurance, and all other costs of that nature . . ." Ripsom, 1988 Del. Super. Lexis 117 at *40. Where a party fails to present evidence regarding its expenses, it is not entitled to lost profits because it has not established its net loss. See, e.g.,Clayton v. Howard Johnson Franchise Systems, Inc., 954 F.2d 645, 652
(11th Cir. 1992) ("If the party presents evidence only of gross receipts or fails to prove expenses with some specificity, an award of damages relating to lost profits will be reversed."); Omura v. American RiverInvestors, 894 P.2d 113, 115 (Haw.App.Ct. 1995); Thomasville FurnitureIndus., Inc. v. The Elder-Beerman Stores, Corp., 250 B.R. 609, 624
(S.D.Ohio 1998) ("a plaintiff seeking lost profits must prove not only gross profits, but also the expenses and costs associated with obtaining those profits."), appeal dismissed, 201 F.3d 1440 (6th Cir. 1999).
In Omura v. American River Investors, 894 P.2d 113, 115 (Haw.App.Ct. 1995), the court considered whether plaintiff was entitled to lost profits damages where the plaintiff failed to present evidence as to its costs and the court's "award was based upon, at best, on the court's guess as to what [the] expenses [were]." Omura, 894 P.2d at 115. In considering this issue, the court applied the rule that "damages for lost profits are measured by the loss of net profits, meaning net earnings or the excess of returns over expenditures, but not lost gross profits or gross sales revenue." Id. Applying this rule, the court held that the plaintiff was only entitled to nominal damages because "a plaintiff fails CT Page 4097 to prove lost profits, i.e., net profits, where the plaintiff submits evidence of lost gross sales revenue but neglects to submit any evidence of costs or expenditures related to the gross sales revenue." Id.
Similarly, in this case, MCM failed to present any competent evidence concerning the expenses that it would have incurred in performing its obligations pursuant to the National Management Agreement. Ms. Scotti was again the only witness who testified for the plaintiff as to what expenses MCM would have incurred in generating the 38 leases over 40 months. Her testimony was not based on MCM's real experience. The expenses which she claimed MCM would have incurred with respect to those leases were markedly differenct from the expenses MCM actually incurred for the same period.
Ms. Scotti testified as to the amount of MCM expenses associated with the supposed 38 leases by opining that MCM would incur expenses of $363 commission, $150 for site survey, $600 for travel, and $1200 for construction supervision for a total of $2313 per lease. She apparently anticipated that MCM would be successful in obtaining a lease every time it incurred any expense, because she did not allow for any expense, for example travel or site surveys, which did not produce a lease. Clearly, this was unrealistic. According to the federal income tax returns for 1996, MCM had incurred 251, 963 in variable expenses in 1996, while it was attempting to market the National Management Agreement properties, but failed to produced one lease.
In addition although paragraph 3.e of the National Management Agreement required MCM to manage all lease sites consistent with applicable FCC and FAA rules and regulations and in keeping with legal requirements, Ms. Scotti allocated no amount at all to legal and accounting expenses. In its 1996 federal income tax return, for example, MCM has listed an expense of $73,976 for "Legal Accounting."
A comparison between MCM's actual percentage of variable expenses to gross profits and that posited by Ms. Scott underscores the speculative and impermissible nature of her testimony with respect to expenses. The MCM federal income tax return for 1999 shows that MCM had $1,646,428 in gross profits and $437,029 in variable expenses, an expense to income ratio of 26%. In 2000 MCM had gross income of $1,651,716 and variable expenses of $501,399, for an expense to income ratio of 30%. However, based on Ms. Scotti's testimony as to anticipated expenses, Arthur Haut, an accountant called by the plaintiff, opined that in 1999 MCM would received income from the anticipated leases in the amount of $837,078 and would have incurred variable expenses associated with that gross income of only $53,410, resulting in an expense to income ratio of only 6.3%. CT Page 4098
In summary, MCM's only evidence of anticipated lost profits was not based on its actual profit history, but rather on speculative numbers which bore no relationship to reality either on the income or the expense side. The evidence of future anticipated leases was based on impermissible speculation from an unqualified witness and the evidence of expenses related to those leases bore no relationship whatsoever to the expenses the plaintiff had actually incurred in the course of its business. For the foregoing reasons, the verdict in favor of MCM is hereby set aside and the court enters judgment in favor of MCM in the amount of one dollar.
By the court,
 ____________________ Aurigemma, J.